### UNITED STATES DISTRICT COURT
### SOUTHERN DISTRICT OF INDIANA
### Indianapolis Division

**Collyer Smith**, individually,
and on behalf of all those
similarly situated;

        Plaintiff,

v.

**Golden Rule Insurance Company;
Savvysherpa Administrative Services,
LLC;  and United Healthcare Services,
Inc.;**

        Defendants.

_____/

**CASE NO**.: **1:20-cv-2066**


**BREACH OF CONTRACT CLASS
ACTION**

**JURY TRIAL DEMANDED**


### CLASS ACTION COMPLAINT AND DEMAND FOR JURY TRIAL
### UNDER FED. R. CIV. P. 23(b)(1) & 23(b)(3)

Plaintiff Collyer Smith, individually and on behalf of all those similarly situated,

asserts, to the best of his knowledge, information, and belief, formed after an inquiry

reasonable under the circumstances, the following:

#### INTRODUCTION AND NATURE OF THIS ACTION

**1.** Plaintiff Collyer Smith challenges Defendants' standardized practice

presumptively denying from coverage as not medically necessary 1) urine analysis tests

given to persons with a history substance use disorder; <u>and</u> 2) services performed by

intensive outpatient drug treatment centers. The urine analysis tests (commonly known

as "UAs") are standard in the treatment of persons with drug and alcohol addiction

histories; providers *must* know whether their patients are using drugs, and what drugs they are using. Intensive outpatient treatment centers (known as "IOPs") are used effectively by treatment providers as an evidence-based level of care for many patients. This treatment environment has decades of research behind it as an appropriate part of the continuum for many patients. Defendants' coverage position – that these tests and services are not "medically necessary"- breaches the terms of its health insurance policies with Smith and all other class members.

2.      With this action, plaintiff and class members seek to recover coverage for charges incurred to pay for the urine analysis tests and IOP services and, further,  to enjoin defendants from breaching the terms of its contract that promises to cover services that are "medically necessary."

### JURISDICTION AND VENUE

3.      This Court has jurisdiction under 28 U.S.C. § 1332(d) because the amount in controversy exceeds $5 million and at least one class member is diverse from the defendant in this case.

4.      Venue is appropriate in this judicial district because the at least some of the defendants reside within and are citizens of this judicial district. Each defendant conducts considerable business within this district as well, and many of the breaches described here occurred within this judicial district.

### PARTIES

5.      Plaintiff Collyer Smith, at all material times, resided in Ann Arbor, Michigan. On February 1, 2013, Smith, his wife and his son entered into a health

insurance contract with defendant Golden Rule.  The insurance provided is technically a group plan provided through the Federation of American Consumers and Travelers, which is a consumer association. Because this is not an employer-sponsored health insurance plan, however, it is not subject to ERISA.  The certificate of coverage setting forth the contractual obligations of the parties is attached at **Exhibit A**.

6.    Smith has always made his premium payments, never been late with his payments and never cancelled the policy.

7.    Golden Rule Insurance Company is a private health insurance company. It was founded in 1940 with its headquarters located in Indianapolis, Indiana. It is incorporated in Illinois. In 2003, Golden Rule was acquired by UnitedHealth Group, Incorporated, based in Minnetonka Minnesota. In this complaint, "Golden Rule" refers to the named defendant as well as to any subsidiary, corporate, successor, predecessor or related entity to which these allegations pertain. Golden Rule has no employees.

8.    Savvysherpa Administrative Services, LLC is a Minnesota entity, which was acquired by UnitedHealth Group in 2017 and thereafter became a subsidiary of co-defendant United Healthcare Services. SavvySherpa performed administrative services for Golden Rule in performance of its contract duties (**Ex. A, ECF 1-1 p. 72**). In this complaint, "Savvysherpa" refers to the named defendant as well as to any subsidiary, corporate, successor, predecessor or related entity to which these allegations pertain. Savvysherpa directly participates in the administration of the Golden Rule contract.

9.    United HealthCare Services, Inc. is a Minnesota corporation. Like Golden Rule and Savvysherpa, it is a subsidiary of UnitedHealth Group Incorporated. United

HealthCare Services (known as "UHS") provides all employee services for Golden Rule. In this complaint, "UHS" refers to the named defendant as well as to any subsidiary, corporate, successor, predecessor, or related entity to which these allegations pertain. UHS directly participates in the administration of the Golden Rule contract.

10.     In this case, the three named defendants will be collectively referred to as "defendants" unless otherwise specifically so indicated.

11.     Collyer Smith has satisfied all of the conditions precedent required in his Golden Rule certificate before commencing this lawsuit, including exhausting all required appeals and notifying Golden Rule of his intent to bring this lawsuit.

FACTS

**Golden Rule's coverage promises**

12.     Defendants' coverage grant language provides that "we will pay benefits for a loss as set forth in the policy." (**Ex. A, ECF 1-1 p. 2**).  The contract promises to pay for "Covered Expenses," which means "an expense: (A) incurred while you or your dependent's insurance is in force under the policy; (B) covered by a specific benefit provision of the policy; and (C) not excluded anywhere in the policy." (**Ex. A, ECF 1-1 p. 17**).  This broad coverage grant is limited by the following: "Even if not specifically excluded by the policy, no benefit will be paid for a service or supply unless it is … [m]edically necessary to the diagnosis or treatment of an injury or illness." (***Id.*, ECF 1-1 p. 41**).

13.     "Medically necessary," in turn, "means a treatment, test, procedure or confinement that is necessary and appropriate for the diagnosis or treatment of an

illness or injury. This determination will be made by us based on our consultation with an appropriate medical professional. A treatment, test, procedure or confinement will not be considered medically necessary if: (A) it is provided only as a convenience to the covered person or provider; (B) it is not appropriate for the covered person's diagnosis or symptoms; or (C) it exceeds (in scope, duration, or intensity) that level of care which is needed to provide safe, adequate, and appropriate diagnosis or treatment to the covered person. [] The fact that any particular doctor may prescribe, order, recommend, or approve a treatment, test, procedure or confinement does not, of itself, make the treatment, test, procedure or confinement medically necessary." (*Id.,* **ECF 1-1 p. 20**).

14.    Plaintiff's and class members' policies contain a provision stating that the policy conforms to state law and will be considered amended to conform with any changes to state law:

> CONFORMITY WITH STATE LAW: This Coordination of Benefits provision complies with the current laws of the state in which this certificate was issued. If the law changes, or if you move your residence, your certificate will be considered to be amended to reflect applicable state law.

*Id.,* **ECF 1-1 p. 50.**

15.    Defendants' certificate expressly covers mental disorders, including "substance abuse," which is defined in the Policy to mean: "alcohol, drug or chemical abuse, overuse or dependency." *Id.,* **ECF 1-1 p. 22.** The certificate of coverage expressly states that it covers mental health disorders, including substance abuse, to the same extent as any other illness under the policy/certificate:

> Covered expenses are amended to include charges incurred for the diagnosis and treatment of *mental disorders*, including *substance abuse*, to the same extent as any other illness under the policy/certificate. Unless specifically stated otherwise, benefits for *mental disorders* and *substance abuse* are subject to the terms and conditions of the *policy,* including any applicable *deductible amounts*, coinsurance and *copayment amounts.*

*Id.,* **ECF 1-1 p. 59** (emphasis in original).

16.     Defendants' certificate of coverage is a boilerplate document containing standardized contract terms. Its coverage terms are identical throughout its coverage lines and books of business. These highlighted terms are common to all class members' certificates of coverage.

17.     Based on a purported lack of medical necessity, defendants consistently single out mental disorders, including substance use disorders, for disparate treatment and refuse to cover charges incurred for the diagnosis and treatment of such disorders to the same extent as comparable charges arising out of medical/surgical services.

18.     Defendants do not cover expenses, including charges incurred for the diagnosis and treatment of substance abuse – including UA tests and IOP treatment – to the same extent as comparable charges arising out of medical/surgical services.

19.     For example, defendants use different coverage criteria to presumptively deny coverage for services rendered at IOPs than they employ for coverage determinations involving "[o]utpatient surgical facilit[ies]" defined in the Policy as:

> any facility with a medical staff of doctors which operates pursuant to law for the purpose of performing surgical procedures; and which does not provide accommodations for patients to stay overnight. This does not include facilities such as: acute-care clinics, urgent-care clinics, ambulatory care clinics, urgcenters, free-standing emergency facilities and doctor offices.

*Id.,* **ECF 1-1 p. 21.**

**20.**    Defendants also use different coverage criteria to presumptively deny

coverage for services rendered at IOPs than they employ for coverage determinations

involving "[i]ntensive day rehabilitation," defined in the Policy as:

> two or more different types of therapy provided by one or more
> rehabilitation medical practitioners and performed for three or more
> hours per day, five to seven days per week.

*Id.,* **ECF 1-1 p. 20.**

**21.**    Defendants also use different coverage criteria to presumptively deny

coverage for services rendered at IOPs than they employ for coverage determinations

involving "[r]ehabilitation," which means:

> care for restoration (including by education or training) of one's prior ability to
> function at a level of *maximum therapeutic benefit.* This type of care must be *acute
> rehabilitation, subacute rehabilitation,* or *intensive day rehabilitation,* and it includes
> *rehabilitation therapy,* and *pain management programs.*

*Id.,* **ECF 1-1 p. 22.**

**Collyer Smith's U.A. tests**

**22.**    Collyer C. Smith, born November 7, 1994, was covered under the same

certificate of coverage as his father. He was entitled to the same contractual obligations

and benefits as his father.

**23.**    Collyer C. Smith had significant and severe mental health concerns. At

various times in his teens, he was diagnosed with persistent depressive disorder,

generalized anxiety disorder, specific learning disorder, developmental coordination

disorder and opiate use disorder.

24.     Collyer C. Smith was a cooperative and willing patient. To treat his disorders, he agreed to be a patient at a wilderness therapy treatment center. He regularly saw counselors and therapists.

25.     In late 2017, Collyer C. Smith was receiving treatment at an intensive outpatient center, followed by residency at a sober home. As part of his treatment, Collyer C. Smith was regularly tested for drug use. The test employed was a conventional and appropriate urine analysis testing methodology performed by Alere Toxicology. The tests were required by Collyer C. Smith's treatment providers to accurately assess and monitor his conditions.

26.     Between late 2017 and early 2018, Collyer C. Smith was given several dozen urine tests. In all, his father was charged $1,560.30 for the tests.

27.     Collyer C. Smith overdosed and died on January 12, 2018. His death certificate listed the cause of death as a lethal combination of heroin, cocaine and fentanyl.

**Defendants refused to cover the UA drug tests**

28.     All of the Alere UA drug tests were submitted to defendants for payment. Defendants refused to pay for a single test. Collyer Smith – Collyer C. Smith's father – invoked defendants' internal appeals process. These appeals generated two decisions, both affirming defendants' original denial.

29.     The first decision dated February 21, 2018 – a month after Collyer C. Smith died – acknowledges Collyer C. Smith's profound and ultimately fatal mental health issues. Nevertheless, the decision affirms defendants' denial of coverage. The rationale,

however, makes no sense. First, the report asserts, without qualification, that "[u]rine drug screening is medically necessary for treatment at all levels of care for addictive disorders." With that acknowledged, the report asserts that "[u]rine drug testing should be conducted at initiation of treatment and when level of arousal is altered or when behavior is aberrant as well as approximately once per week at random…"

30.    A second review was generated on May 1, 2018. Again, defendants' denial was affirmed. The rationale was similar; the denial was affirmed because "[t]he patient had not used since June, of 2017 and had no withdrawal symptoms."

31.    The February 21, 2018 affirmance asserted that Collyer Smith had the "right to file a civil action … if all required reviews of your claims have been completed." The state of Michigan has a voluntary external review process, but its invocation is not required for bringing a claim in court to challenge a coverage position. Accordingly, Collyer Smith has exhausted "all required reviews."

32.    Collyer Smith was billed for UA drug tests for months after his son died.

**Collyer C. Smith's UA drug tests were medically necessary under the Defendants' coverage promises**

33.    As defendants acknowledged in the review of Collyer Smith's claim, regular and comprehensive urine analysis is "necessary and appropriate" for the diagnosis or treatment of alcohol and drug abuse. UA drug testing is used to detect the presence or absence of a specific drug (or drugs) as well as drug metabolites.

34.    A drug metabolite is a byproduct of the body breaking down, or "metabolizing," a drug into a different substance.  The process of metabolizing a drug is

predictable and certain; everyone metabolizes drugs the same way. Therefore, the presence of a drug metabolite can be a reliable indicator that a person used the "parent" drug of that metabolite. *See https://www.alcopro.com/knowledge-base/what-are-drug-metabolites.*

35.    Substance use disorders are chronic, relapsing health conditions that require ongoing medical and clinical interventions consistent with medical practices used to treat other chronic health conditions.

36.    Because evidence suggests that drug testing assists with monitoring adherence and abstinence in treatment and can improve patient outcomes, drug testing should be used widely in addiction treatment settings.

37.    For people in addiction treatment, frequency of drug testing should be dictated by patient acuity and level of care; as well as the treatment providers' clinical assessment.

38.    UA Drug testing should be scheduled more frequently at the beginning of treatment; testing frequency should be decreased as recovery progresses. Testing should be for therapeutic purposes in addiction medicine when treating all substance use disorders to identify or support diagnosis; prevent or deter further use, and to support abstinence in active treatment and chronic care management.

39.    Definitive testing techniques are clinically necessary whenever a provider needs to detect specific substances not identified by presumptive methods, quantify levels of the substance present, and/or ensure the accuracy of the results.

40.     The American Society of Addiction Medicine (known as ASAM) is the nation's leading organization representing medical professionals who specialize in addiction prevention and treatment, and setting forth generally accepted standards of care in the field. It is ASAM policy that the elements of UA drug testing (e.g., matrix, drug panel, testing technology) be determined by the provider based on patient-specific needs, not by arbitrary limits from insurance providers.

41.     In a 2010 policy statement, ASAM recognized UA drug testing as a part of medical care for people being treated for drug addiction. The Statement expressed ASAM policy that UA drug testing should not face undue restrictions; decisions about the types and frequency of testing should be made by the ordering physician; and arbitrary limits on reimbursement by payers interfere with the physician's judgment **and violate parity laws.**

42.     Clinical drug treatment testing, including urine drug testing, is medically necessary for all levels of care for addictive disorders.

43.     Under any formulation, Collyer C. Smith's UA drug tests were "medically necessary" and should have been covered under Defendants' certificate of coverage.

**Collyer Smith's IOP services**

44.     Intensive outpatient programs (known as IOPs) are treatment programs used to address addictions, depression, eating disorders, or other dependencies that do not require detoxification or round-the-clock supervision. They enable patients to continue with their normal, day-to-day lives in a way that residential treatment programs do not. Whereas residential treatment programs require that patients reside

on-site, patients in intensive outpatient programs live at home. IOPs are sometimes used with inpatient programs as a way of helping patients more smoothly and seamlessly adapt back into their families and communities. They are designed to establish support mechanisms, help with relapse management, and provide coping strategies.

45.    PACE Recovery Center is a nationally-recognized mental health and substance abuse treatment center located in southern California. Collyer C. Smith was treated at PACE's IOP program from September 11, 2017 to December 28, 2017. He incurred $44,290 in charges for services rendered, which his father paid in full.

46.    On March 9, 2019, a Golden Rule representative wrote to Collyer Smith rejecting the coverage request for the IOP services rendered on grounds that they were not "medically necessary." The letter enclosed a worksheet that, in two places, required the case analyst to explain why the services were not medically necessary. No information was provided in either place on the worksheet.

47.    Collyer Smith appealed that decision. On May 3, 2018, he received a new letter, signed by a Golden Rule "investigator," that affirmed the previous denial.  No explanation of the rationale supporting this decision was offered.

48.    Defendants consistently failed to apply the proper criteria in determining whether plaintiff's and class members' UA tests and IOP treatments were medically necessary. Therefore, each decision is improper and must be revaluated under proper criteria.

## CLASS ALLEGATIONS

**49.**      Collyer Smith brings this class action on behalf of two breach of contract classes and a direct Parity Act violation class. The "UA Class" is:

> *All persons (a) insured by a certificate of coverage (b) underwritten by Golden Rule (c) whose coverage is not regulated by ERISA and (d) who were being treated for substance abuse and (e) whose urine drug tests were not covered (f) because the tests were deemed not "medically necessary" (or verbiage to the same effect).*

**50.**      The "IOP Class" is

> *All persons (a) insured by a certificate of coverage (b) underwritten by Golden Rule (c) whose coverage is not regulated by ERISA and (d) who were being treated for substance abuse and (e) whose IOP treatments  not covered (f) because the services were deemed not "medically necessary" (or verbiage to the same effect).*

**51.**      The class period for both classes began six years before the commencement of this action and concludes on the date the classes are certified.

**52.**      The exact number of members of either class is not known, but it is estimated there are thousands in either class.  Accordingly, class membership is so numerous that joinder of individual members of the two classes in this action is impracticable.  Individual class members are identifiable as the names and addresses of all members of both classes are contained in business records maintained by defendants and may be obtained through discovery.

**53.**      Collyer Smith's claim raises questions of law or fact common to both classes that predominate over any questions solely affecting individual class members in either class.  Collyer Smith's claims arise from the same practice or course of conduct and routine coverage adjudication by defendants that gives rise to all claims.  All class

members are insured by certificates of coverage with identical coverage terms. The claims are all based on the same legal theory of breach of contract.

54.    The claims of Collyer Smith are typical of the claims of all members of either class because defendants employ the same contracts, coverage language, and coverage practices, for each and every member of the two classes. The same legal theories are raised for each member of the two classes.

55.    Collyer Smith can fairly and adequately protect and represent the interests of each member of both classes because he has no conflict of interest in this cause of action with either of the two classes and their membership. Collyer Smith's interests are perfectly aligned with the members of both classes and have a mutual interest in seeking damages and other relief against defendants. Collyer Smith is represented by competent and experienced class action counsel.

56.    This action is maintainable under Fed. R. Civ. P. 23(b)(1) because the prosecution of separate actions by individual members of either class would create a risk of inconsistent or varying adjudications with respect to individual members of the class that would establish incompatible standards of conduct for defendants.

57.    Alternatively, this action is maintainable under Fed. R. Civ. P. 23(b)(3) because the questions of the law or fact common to Collyer Smith's claim and the claims of each member of the class predominate over any question of law or fact affecting only individual members of the two classes, and class representation is superior to other available methods for fair and efficient adjudication of this controversy. The common questions for plaintiff and the two classes pervade and predominate the individualized

claims because they are based on the common question of whether defendants engaged in a common course of conduct and business practice that resulted in its coverage denial for medically necessary drug tests and/or IOP services. Defendants acted toward the class members of both classes in a similar or common way. Moreover, all of the members of both classes were insured under policies of insurance underwritten by Golden Rule with materially identical coverage terms. The superiority requirement is satisfied as well because a class action is the most manageable and efficient way to resolve the individual claims of this nationwide class.

**COUNT I**
**BREACH OF CONTRACT**
**BROUGHT INDIVIDUALLY AND ON BEHALF OF THE UA CLASS**

**58.**      Collyer Smith realleges and incorporates paragraphs 1-57 as if fully set forth.

**59.**      Collyer Smith's first claim is for breach of contract. It is brought on his own behalf, and on behalf of the UA Class.

**60.**      Collyer Smith and defendants had entered into the contract attached as Exhibit A to this Complaint in 2013 and had renewed the contract in all relevant subsequent years.

**61.**      Defendants breached the terms of the certificates of coverage that they underwrite/administer when they denied coverage of medically necessary drug tests for the diagnosis and treatment of substance abuse disorders.

**COUNT 2**
**BREACH OF CONTRACT**
**BROUGHT INDIVIDUALLY AND ON BEHALF OF THE IOP CLASS**

62.     Collyer Smith realleges and incorporates paragraphs 1-57 as if fully set forth.

63.     Collyer Smith's second claim is for breach of contract. It is brought on his own behalf, and  on behalf of the IOP Class.

64.     Collyer Smith and defendants had entered into the contract attached as Exhibit A to this Complaint in 2013 and had renewed the contract in all relevant subsequent years.

65.      Defendants breached the terms of the certificates of coverage that they underwrite/administer when they denied insurance coverage of medically  necessary, Intensive Out Patient  services for the treatment of substance abuse disorders.

**COUNT 3**
**BREACH OF CONTRACT FOR VIOLATING INCORPORATED PARITY ACT PROTECTIONS**
**BROUGHT INDIVIDUALLY AND ON BEHALF OF THE UA CLASS**

66.     Collyer Smith realleges and incorporates paragraphs 1-57 as if fully set forth.

67.     Collyer Smith's third claim is for breach of contract for violations of the incorporated Parity Act protections. It is brought on his own behalf, and on behalf of the UA Class. The legal claim is a breach of contract for violating the protections of the federal Parity Act, which are incorporated as a matter of law into defendants' contracts with members of the UA Class.

68.     It is a general principle of insurance law that all insurance plans include applicable requirements and restrictions imposed by law. Laws regulating insurance thus enters into and forms a part of all contracts of insurance to which it is applicable. When an insurance policy provision is in conflict with, or repugnant to, statutory provisions which are applicable to the contract, the inconsistent insurance policy provisions are invalid since contracts cannot change existing statutory laws. Moreover, when such a conflict exists, the statutory requirements supersede the conflicting policy provisions and become part of the insurance policy itself.

69.     The federal Parity Act specifically applies to defendants' certificate of coverage covering Collyer Smith and all class members. 42 U.S.C. § 18031(j); 45 C.F.R. § 147.160 (a). The Act governed Collyer Smith's insurance coverage with defendants beginning with the first policy renewal after July 1, 2014.  2014.   *Id.* § (i); 45 C.F.R. § 147.160.  Accordingly, violations occurring after that date can be enforced through a breach of contract claim.

70.     Under the Parity Act, health insurers must "treat sicknesses of the mind in the same way that they would a broken bone." *New York State Psychiatric Ass'n, Inc. v. United Health Grp.,* 980 F. Supp.2d 527, 542 (S.D.N.Y.), *aff'd in part, vacated in part*, 798 F.3d 125 (2nd Cir. 2015). The Act governed Collyer Smiths Insurance Policy beginning with the first policy renewal after July 1, 2014.  2014.   *Id.* § (i); 45 C.F.R. § 147.160.

71.     A "treatment limitation" is a limit on either "the scope or duration of treatment." 29 U.S.C. § 1185(a)(3)(B)(iii).

72.     Regulations promulgated under this statute focus the Court's analysis in two respects. First, both "quantitative" and "nonquantitative" treatment limitations may run afoul of the Parity Act.  45 C.F.R § 146-136(a). Whereas a quantitative limitation is reduceable to a number, a nonquantitative treatment limitation is any other limitation on the scope or duration of treatment. *Id.* at (c)(4)(i).

73.     Second, any limitation applied to mental health treatment must be scrutinized by comparing it to the limitations placed on an analogous medical or surgical treatment in the same classification. *Id.* at (c)(2)(i)-(ii).

74.     The limitation at issue is the manner in which defendants interpret and calibrate its "medically necessary" standard applicable to UA tests. Defendants do not presumptively conclude that UA tests are medically necessary even when treating physicians recommend it and even when such tests are considered standard and medically appropriate by the overwhelming majority of relevant providers.

75.     In contrast, defendants presumptively authorize coverage for comparable medical surgical services such as diagnostic tests, for blood glucose monitoring, for urine tests for diabetics, for insulin, for injection aids, syringes and needles, all used in the treatment of diabetes. This disparate treatment results in defendants being out of parity with how it covers UA tests used to monitor persons with drug and/or alcohol addiction and/or abuse issues. This disparate treatment in comparable services violates the federal Parity Act as incorporated into defendants' certificates of coverage.

**COUNT 4**
**BREACH OF CONTRACT FOR VIOLATING INCORPORATED PARITY ACT PROTECTIONS**
**BROUGHT INDIVIDUALLY AND ON BEHALF OF THE IOP CLASS**

**76.**     Collyer Smith realleges and incorporates paragraphs 1-57 as if fully set forth.

**77.**     Collyer Smith's fourth claim is for breach of contract for violations of the incorporated Parity Act protections. It is brought on his own behalf, and on behalf of the IOP Class. The legal claim is a breach of contract for violating the protections of the federal Parity Act, which are incorporated as a matter of law into defendants' contracts with members of the IOP Class.

**78.**     It is a general principle of insurance law that all insurance plans include applicable requirements and restrictions imposed by law. Laws regulating insurance thus enters into and forms a part of all contracts of insurance to which it is applicable. When an insurance policy provision is in conflict with, or repugnant to, statutory provisions which are applicable to the contract, the inconsistent insurance policy provisions are invalid since contracts cannot change existing statutory laws. Moreover, when such a conflict exists, the statutory requirements supersede the conflicting policy provisions and become part of the insurance policy itself.

**79.**     The federal Parity Act specifically applies to defendants' certificate of coverage covering Collyer Smith and all class members. 42 U.S.C. § 18031(j); 45 C.F.R. § 147.160 (a). The Act governed Collyer Smith's insurance coverage with defendants beginning with the first policy renewal after July 1, 2014. 2014.  *Id.* § (i); 45 C.F.R. §

147.160.  Accordingly, violations occurring after that date can be enforced through a breach of contract claim.

80.    Under the Parity Act, health insurers must "treat sicknesses of the mind in the same way that they would a broken bone." *New York State Psychiatric Ass'n, Inc. v. United Health Grp.*, 980 F. Supp.2d 527, 542 (S.D.N.Y.), *aff'd in part, vacated in part*, 798 F.3d 125 (2nd Cir. 2015). The Act governed Collyer Smiths Insurance Policy beginning with the first policy renewal after July 1, 2014.  2014.  *Id.* § (i); 45 C.F.R. § 147.160.

81.    A "treatment limitation" is a limit on either "the scope or duration of treatment." 29 U.S.C. § 1185(a)(3)(B)(iii).

82.    Regulations promulgated under this statute focus the Court's analysis in two respects. First, both "quantitative" and "nonquantitative" treatment limitations may run afoul of the Parity Act.  45 C.F.R § 146-136(a). Whereas a quantitative limitation is reduceable to a number, a nonquantitative treatment limitation is any other limitation on the scope or duration of treatment. *Id.* at (c)(4)(i).

83.    Second, any limitation applied to mental health treatment must be scrutinized by comparing it to the limitations placed on an analogous medical or surgical treatment in the same classification. *Id.* at (c)(2)(i)-(ii).

84.    The limitation at issue is the manner in which defendants interpret and calibrates its "medically necessary" standard applicable to IOP services. Defendants do not presumptively conclude that IOP services are medically necessary even when treating physicians recommend it and even when such services are considered standard and medically appropriate by the overwhelming majority of relevant providers.

85.    In contrast, defendants do not presumptively deny coverage for comparable medical surgical services such as services rendered at outpatient surgical facilities, intensive day rehabilitation and rehabilitation and chemotherapy treatment. This disparate treatment results in defendants being out of parity with how it covers IOP services. This disparate treatment in comparable services violates the federal Parity Act as incorporated into defendants' certificates of coverage.

### JURY DEMAND

Plaintiff Collyer Smith demands a jury by jury on all counts so triable.

**WHEREFORE**, plaintiff Collyer Smith, and all other persons similarly situated, demands judgment against defendants, for damages, interest, costs, attorney's fees including enhancement of fees, a trial by jury for all issues so triable, and such other relief as this Court deems just and proper.

DATED: August 7, 2020                    Respectfully submitted,


/s/ *Kathleen A. DeLaney*
Kathleen A. Delaney (#18604-49)
**DELANEY & DELANEY LLC**
kdelaney@delaneylaw.net
3646 Washington Boulevard
Indianapolis, IN 46205
Tel: (317) 920-0400
Fax: (317) 920-0404

**GREG COLEMAN LAW**
Greg F. Coleman
Arthur Stock
Ryan P. McMillan
greg@gregcolemanlaw.com
arthur@gregcolemanlaw.com
ryan@gregcolemanlaw.com

800 South Gay Street
Suite 1100
Knoxville, TN 37929
Tel: (865) 247-0080
Fax: (865) 522-0049

**CRUEGER DICKINSON LLC**
Charles Crueger
Benjamin Kaplan
4532 North Oakland Avenue
Whitefish Bay, WI 53211
Tel: (414) 210-3868

**WALLACE WEXLER**
Edward Wallace
55 West Monroe Street
Suite 3300
Chicago, IL 60603
Tel: (312) 346-2222

**JORDAN LEWIS, P.A.**
Jordan Lewis
[jordan@jml-lawfirm.com](mailto:jordan@jml-lawfirm.com)
4473 N.E. 11th Avenue
Fort Lauderdale, FL 33334
Tel: (954) 616-8995
Fax: (954) 206-0374

*Attorneys for Plaintiff*