UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF INDIANA
INDIANAPOLIS DIVISION

| | |
|---|---|
| COLLYER SMITH, *individually and on behalf of all those similarly situated*, | ) ) ) |
| *Plaintiff*, | ) ) |
| vs. | ) No. 1:20-cv-02066-JMS-TAB ) |
| GOLDEN RULE INSURANCE COMPANY, SAVVYSHERPA ADMINISTRATIVE SERVICES, LLC, and UNITED HEALTHCARE SERVICES, INC., | ) ) ) ) ) |
| *Defendants*. | ) ) |

## ORDER

Plaintiff Collyer Smith ("Mr. Smith"), individually and on behalf of all those similarly situated, brings this action against Defendants Golden Rule Insurance Company, Savvysherpa Administrative Services, LLC, and United Healthcare Services, Inc. (collectively, "Golden Rule"),[1] challenging Golden Rule's denial of health insurance coverage for certain substance-abuse-related treatments received by his son, Collyer C. Smith ("Collyer C."), and its alleged standardized practice of presumptively denying coverage for such services. Mr. Smith asserts claims for breach of contract and for violations of the Paul Wellstone and Pete Domenici Mental Health Parity and Addiction Equity Act of 2008 ("the Parity Act"). Defendants have filed a Partial Motion to Dismiss pursuant to Federal Rules of Civil Procedure 12(b)(1) and 12(b)(6), [Filing No. 30], which is now ripe for the Court's review.

---

[1] Mr. Smith in the Complaint and both parties in their briefing address Defendants collectively, so the Court will do the same for purposes of deciding the Motion to Dismiss. [*See* Filing No. 1; Filing No. 32 at 7; Filing No. 54 at 6 n.1.]

1

# I.
## STANDARD OF REVIEW

Under Rule 12(b)(6), a party may move to dismiss a claim that does not state a right to relief.  The Federal Rules of Civil Procedure require that a complaint provide the defendant with "fair notice of what the . . . claim is and the grounds upon which it rests." *Erickson v. Pardus*, 551 U.S. 89, 93 (2007) (quoting *Bell Atlantic v. Twombly*, 550 U.S. 544, 555 (2007)).  In reviewing the sufficiency of a complaint, the Court must accept all well-pled facts as true and draw all permissible inferences in favor of the plaintiff. *Alarm Detection Sys., Inc. v. Vill. of Schaumburg*, 930 F.3d 812, 821 (7th Cir. 2019).  A Rule 12(b)(6) motion to dismiss asks whether the complaint "contain[s] sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'" *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (quoting *Twombly*, 550 U.S. at 570).  "A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Id.* (citing *Twombly*, 550 U.S. at 556).  "Threadbare recitals of the elements of a cause of action, supported by mere conclusory statements, do not suffice." *Iqbal*, 556 U.S. at 678 (citing *Twombly*, 550 U.S. at 555).  Factual allegations must plausibly state an entitlement to relief "to a degree that rises above the speculative level." *Munson v. Gaetz*, 673 F.3d 630, 633 (7th Cir. 2012).  This plausibility determination is "a context-specific task that requires the reviewing court to draw on its judicial experience and common sense." *Id.*

"Federal Rule of Civil Procedure 12(b)(1) allows a party to move to dismiss a claim for lack of subject matter jurisdiction." *Hallinan v. Fraternal Order of Police of Chicago Lodge No. 7*, 570 F.3d 811, 820 (7th Cir. 2009).  When deciding a motion to dismiss under Rule 12(b)(1), the Court accepts the allegations in the plaintiff's complaint as true and draws all reasonable inferences in the plaintiff's favor. *Long v. Shorebank Dev. Corp.*, 182 F.3d 548, 554 (7th Cir. 1999).  *See*

also *Apex Digital, Inc. v. Sears, Roebuck & Co.*, 572 F.3d 440, 443 (7th Cir. 2009) ("Facial challenges [to subject matter jurisdiction] require only that the court look to the complaint and see if the plaintiff has sufficiently alleged a basis of subject matter jurisdiction." (emphasis omitted)).

## II.
### BACKGROUND

The following are the factual allegations contained in the Complaint, which the Court must accept as true at this time.

### A. The Policy

On February 1, 2013, Mr. Smith, his wife, and Collyer C. entered into a health insurance contract with Golden Rule ("the Policy"). [Filing No. 1 at 2-3.] In relevant part, the Policy covers coinsurance in excess of the applicable deductible for certain covered and eligible expenses. [Filing No. 1-1 at 27.] However, the Policy also provides that "[e]ven if not specifically excluded by the policy, no benefit will be paid for a service or supply unless it is: (A) Administered or ordered by a doctor, and (B) Medically necessary to the diagnosis or treatment of an injury or illness." [Filing No. 1-1 at 41 (emphasis omitted).] As to the medical necessity requirement, the Policy states:

> "Medically necessary" means a treatment, test, procedure or confinement that is necessary and appropriate for the diagnosis or treatment of an illness or injury. This determination will be made by us based on our consultation with an appropriate medical professional. A treatment, test, procedure or confinement will not be considered medically necessary if: (A) it is provided only as a convenience for the covered person or provider; (B) it is not appropriate for the covered person's diagnosis or symptoms; or (C) it exceeds (in scope, duration, or intensity) that level of care which is needed to provide safe, adequate, and appropriate diagnosis or treatment of the covered person. The fact that any particular doctor may prescribe, order, recommend, or approve a treatment, test, procedure, or confinement does not, of itself, make the treatment, test, procedure or confinement medically necessary.

[Filing No. 1-1 at 20 (emphasis omitted).]

3

The Policy contains a rider which states:

Covered expenses are amended to include charges incurred for the diagnosis and treatment of mental disorders, including substance abuse, to the same extent as any other illness under the policy/certificate. Unless specifically stated otherwise, benefits for mental disorders and substance abuse are subject to the terms and conditions of the policy, including any applicable deductible amounts, coinsurance and copayment amounts.

[Filing No. 1-1 at 59 (emphasis omitted).] "Substance abuse" as defined by the Policy "means alcohol, drug or chemical abuse, overuse or dependency." [Filing No. 1-1 at 22.]

**B.   Collyer C.'s History and Treatment**

At various times during his teenage years, Collyer C. was diagnosed with persistent depressive disorder, generalized anxiety disorder, specific learning disorder, developmental coordination disorder, and opiate use disorder. [Filing No. 1 at 7.] To treat these disorders, Collyer C. voluntarily became a patient at a wilderness therapy treatment center and regularly visited counselors and therapists. [Filing No. 1 at 8.]

From September 11, 2017 to December 28, 2017, Collyer C. was a patient in an intensive outpatient program ("IOP") at PACE Recovery Center, a nationally recognized mental health and substance abuse treatment center in southern California. [Filing No. 1 at 12.] IOPs are treatment programs used to treat addictions and other conditions while the patient lives at home. [Filing No. 1 at 11-12.] During his time as a patient in PACE's IOP program, Collyer C. incurred $44,290 in charges for services rendered. [Filing No. 1 at 12.] Mr. Smith paid these charges in full. [Filing No. 1 at 12.]

As a part of his treatment, Collyer C. was regularly tested for drug use through urine analysis ("UA") tests. [Filing No. 1 at 8.] These tests were required by Collyer C.'s treatment providers to accurately assess and monitor his condition and were employed using conventional and appropriate UA testing methodology. [Filing No. 1 at 8.] Between late 2017 and early 2018,

4

Collyer C. was given several dozen UA tests, for which Mr. Smith was charged a total of $1,560.30. [Filing No. 1 at 8.]

On January 12, 2018, Collyer C. overdosed and died. [Filing No. 1 at 8.] His death certificate lists his cause of death as a lethal combination of heroin, cocaine, and fentanyl. [Filing No. 1 at 8.] Mr. Smith was billed for UA tests for months after his son died. [Filing No. 1 at 9.]

### C. Golden Rule's Refusal of Coverage

Golden Rule refused to pay for any of Collyer C.'s UA tests or IOP services. [Filing No. 1 at 8; Filing No. 1 at 12.] Mr. Smith invoked Golden Rule's internal appeals process to appeal the denials of coverage, resulting in three decisions affirming the original denials. [Filing No. 1 at 9.][2]

The first decision, dated February 21, 2018, concluded that the UA tests were not medically necessary. [Filing No. 31-1 at 1.] The accompanying "Peer Review Report" noted that Collyer C. received definitive, rather than presumptive, UA tests and concluded that the definitive tests were not medically necessary because "[p]resumptive urine drug screening is usually sufficient" and definitive screening should only be performed when the presumptive test is in conflict with the patient's own account of his drug use, when a specific drug needs to be tested for, or when the specific level of a drug needs to be known. [Filing No. 31-1 at 7.]

Another decision, dated March 9, 2018, concluded that the IOP services were not medically necessary. [Filing No. 1 at 12; Filing No. 31-2 at 2.] The accompanying medical review states:

---

[2] Along with its Motion to Dismiss, Golden Rule submitted copies of the three decisions denying coverage. [Filing No. 31-1; Filing No. 31-2; Filing No. 31-3.] Because these documents are referenced in the Complaint and central to Mr. Smith's claims, the Court can consider them in ruling on Golden Rule's Motion to Dismiss. See, e.g., 188 LLC v. Trinity Indus., Inc., 300 F.3d 730, 735 (7th Cir. 2002) ("It is also well-settled in this circuit that 'documents attached to a motion to dismiss are considered part of the pleadings if they are referred to in the plaintiff's complaint and are central to his claim. Such documents may be considered by a district court in ruling on the motion to dismiss.'") (quoting Wright v. Assoc. Ins. Cos. Inc., 29 F.3d 1244, 1248 (7th Cir. 1994)). Where appropriate, the Court will cite to these documents in addition to the Complaint.

The available documentation does not clearly detail the reasons for [Collyer C.'s] admission to the IOP level of care. Specifically, there is a lack of information concerning specific information related to the patient's frequency and intensity of substance abuse. In addition, there is no evidence of need for continued treatment at the IOP level of care.

[Filing No. 31-2 at 5.]

A third decision, dated May 3, 2018, similarly concluded that both the UA tests and the IOP services were not medically necessary. [Filing No. 1 at 12; Filing No. 31-3 at 2.] The accompanying medical review concluded that the IOP services were "in excess of the patient's needs," stating:

[Collyer C.] had not used [drugs] since June[] of 2017 and had no withdrawal symptoms. The patient was medically stable and had social supports. The patient had some anxiety, but no acute functioning concerns that required a structured program. In addition, though IOP was billed, the patient appeared to be in a residential setting given the patient did not transition to a sober living environment (SLE) until the end of the week of 12/04/17. The case management notes also referenced that until December of 2017, the patient was in a residential setting. If the patient was in a structured environment or more of a residential setting, this is a misrepresentation of services and is a potential quality issue.

In addition, all of the patient's UA's were negative and it appears that the patient was in a structured setting from September of 2017 – December of 2017 and there was no suspicion of use. None of these requests are recommended for approval as appropriate, efficient and accurate testing, screening and results could have been provided with office-based dip stick testing.

All orders for confirmation testing require a positive screening test and shall be performed only for the drug class representative by the positive screening. When testing is done in high risk populations, including those in addiction treatment, the criminal justice system and return to work settings after addiction treatment, American Society of Addiction Medicine (ASAM) encourages the use of random rather than scheduled drug tests.

[Filing No. 31-3 at 6.]

Mr. Smith maintains that the UA tests and IOP services were medically necessary for Collyer C., and therefore should have been covered by the Policy. [Filing No. 1 at 1-2; Filing No. 1 at 9-12.] Mr. Smith alleges that Golden Rule "consistently failed to apply the proper criteria in

determining whether plaintiff's and class members' UA tests and IOP treatments were medically necessary." [Filing No. 1 at 12.] He alleges that, "[b]ased on a purported lack of medical necessity, defendants consistently single out mental disorders, including substance use disorders, for disparate treatment and refuse to cover charges incurred for the diagnosis and treatment of such disorders to the same extent as comparable charges arising out of medical/surgical services." [Filing No. 1 at 6.] He also alleges that Golden Rule does not cover charges related to the diagnosis and treatment of substance abuse to the same extent it covers comparable charges related to medical and surgical services. [Filing No. 1 at 6.] Mr. Smith asserts that Golden Rule "presumptively den[ies]" coverage for IOP services and in doing so uses "different coverage criteria" than the criteria considered when determining coverage for costs stemming from outpatient surgical facilities, intensive day rehabilitation, and rehabilitation. [Filing No. 1 at 6-7.]

### D. Class Allegations

Mr. Smith brings his claims individually and "on behalf of two breach of contract classes and a direct Parity Act violation class." [Filing No. 1 at 13.] As for the breach of contract classes, Mr. Smith defines the proposed "UA Class" to include:

> All persons (a) insured by a certificate of coverage (b) underwritten by Golden Rule (c) whose coverage is not regulated by ERISA and (d) who were being treated for substance abuse and (e) whose urine drug tests were not covered (f) because the tests were deemed not "medically necessary" (or verbiage to the same effect).

[Filing No. 1 at 13.] Similarly, he defines the proposed "IOP Class" to include:

> All persons (a) insured by a certificate of coverage (b) underwritten by Golden Rule (c) whose coverage is not regulated by ERISA and (d) who were being treated for substance abuse and (e) whose IOP treatments not covered (f) because the services were deemed not "medically necessary" (or verbiage to the same effect).

[Filing No. 1 at 13.] Mr. Smith alleges that the contractual provisions contained in the Policy are common to all proposed class members' health insurance contracts with Golden Rule. [Filing No.

1 at 6.]  He asserts, in relevant part, that his and the class members' claims "are based on the common question of whether defendants engaged in a common course of conduct and business practice that resulted in its coverage denial for medically necessary drug tests and/or IOP services." [Filing No. 1 at 15.]

### E.  Claims in the Complaint

The Complaint contains four counts.  In Count 1, Mr. Smith asserts a breach of contract claim, individually and on behalf of the UA Class, relating to the denial of coverage for UA tests. [Filing No. 1 at 15.]  In Count 2, Mr. Smith asserts a second breach of contract claim, individually and on behalf of the IOP class, relating to the denial of coverage for IOP services.  [Filing No. 1 at 16.]  In Count 3, Mr. Smith, individually and on behalf of the UA Class, alleges that Golden Rule breached the Policy and the class members' health insurance contracts by violating the Parity Act, which is incorporated by law into all of Golden Rule's health insurance contracts.  [Filing No. 1 at 16-18.]  Specifically, Mr. Smith alleges:

> 74. The limitation at issue is the manner in which defendants interpret and calibrate its "medically necessary" standard applicable to UA tests.  Defendants do not presumptively conclude that UA tests are medically necessary even when treating physicians recommend it and even when such tests are considered standard and medically appropriate by the overwhelming majority of relevant providers.

> 75. In contrast, defendants presumptively authorize coverage for comparable medical surgical services such as diagnostic tests, for blood glucose monitoring, for urine tests for diabetics, for insulin, for injection aids, syringes and needles, all used in the treatment of diabetes.  This disparate treatment results in defendants being out of parity with how it covers UA tests used to monitor persons with drug and/or alcohol addiction and/or abuse issues.  This disparate treatment in comparable services violates the federal Parity Act as incorporated into defendants' certificates of coverage.

[Filing No. 1 at 18.]  Similarly, in Count 4, Mr. Smith individually and on behalf of the IOP Class, asserts a claim for breach of contract for violations of the Parity Act.  [Filing No. 1 at 19-21.] Specifically, he alleges:

84. The limitation at issue is the manner in which defendants interpret and calibrate[] its "medically necessary" standard applicable to IOP services. Defendants do not presumptively conclude that IOP services are medically necessary even when treating physicians recommend it and even when such services are considered standard and medically appropriate by the overwhelming majority of relevant providers.

85. In contrast, defendants do not presumptively deny coverage for comparable medical surgical services such as services rendered at outpatient surgical facilities, intensive day rehabilitation and rehabilitation and chemotherapy treatment. This disparate treatment results in defendants being out of parity with how it covers IOP services. This disparate treatment in comparable services violates the federal Parity Act as incorporated into defendants' certificates of coverage.

[Filing No. 1 at 20-21.]

Mr. Smith "and class members seek to recover coverage for charges incurred to pay for the [UA] tests and IOP services and, further, to enjoin defendants from breaching the terms of its contract that promises to cover services that are 'medically necessary.'" [Filing No. 1 at 2.] Golden Rule seeks dismissal of Counts 3 and 4 in their entirety, and seeks dismissal of Counts 1 and 2 only to the extent that Mr. Smith requests injunctive or declaratory relief. [Filing No. 30 at 1.]

### III.
#### DISCUSSION

### A.  Parity Act Claims

Golden Rule argues that Mr. Smith failed to allege a violation of the Parity Act in Counts 3 and 4, and therefore those counts should be dismissed. [Filing No. 32 at 13-20.]  Specifically, Golden Rule asserts that in order to state a claim under the Parity Act, a plaintiff must: (1) identify the treatment limitation that applies to mental health coverage; and (2) "allege a flaw in this limitation based on a comparison to a relevant analogue." [Filing No. 32 at 14 (quoting *Welp v. Cigna Health & Life Ins. Co.*, 2017 WL 3263138, at \*4-5 (S.D. Fla. July 20, 2017)).]  According to Golden Rule, Mr. Smith fails to identify a treatment limitation that applies only to mental health coverage, and he cannot rely on the Policy's medical necessity requirement because that

requirement expressly applies equally to mental health coverage and medical treatment coverage. [Filing No. 32 at 15.] Golden Rule also argues that Mr. Smith's vague assertion "that there was something about 'the manner' in which Golden Rule applied the medical necessity requirement that violated the Parity Act" is insufficient because he does not specifically point to anything in the denial letters or medical reviews to support such a violation. [Filing No. 32 at 15.] In addition, Golden Rule asserts that although Mr. Smith vaguely suggests that Golden Rule should apply a pro-coverage presumption in evaluating mental health costs, it is unclear what presumptions should exist or why, given that the Policy does not refer to any presumptions for or against coverage, either for mental health and substance abuse treatment or for medical treatment. [Filing No. 32 at 15-16.] As for the second element, Golden Rule argues that Mr. Smith failed to allege any specific facts concerning the coverage of analogous medical services. [Filing No. 32 at 16-20.] According to Golden Rule, Mr. Smith makes the conclusory assertion that Golden Rule used different criteria to evaluate substance-abuse-related services without specifying what those different criteria were or explaining how certain covered medical services are analogous to the UAs or IOP services at issue. [Filing No. 32 at 16-17.]

In response, Mr. Smith argues that Golden Rule errs in relying on *Welp* to provide the relevant standard for stating a claim under the Parity Act. [Filing No. 54 at 15-16.] Instead, he asserts, a plaintiff states a claim under the Parity Act by demonstrating that: (1) the health insurance plan includes a treatment limitation for mental health or substance use disorder benefits that is more restrictive than the treatment limitation for medical or surgical benefits; and (2) the mental health or substance use disorder benefit being limited is in the same classification as the medical or surgical benefit to which it is being compared. [Filing No. 54 at 14-15 (citing *Michael W. v. United Behavioral Health*, 420 F. Supp. 3d 1207, 1234 (D. Utah 2019)).] Mr. Smith contends that

10

the Complaint plausibly alleges that Golden Rule violated the Parity Act in two separate ways when it denied coverage of the UA tests and IOP services: first by applying a *separate* treatment limitation applicable only to mental health and substance use disorder benefits, and second by applying a *more restrictive* medical necessity limitation to mental health and substance use disorder benefits than the limitation it applies to medical and surgical benefits. [Filing No. 54 at 12-13.] Regarding the first alleged violation, Mr. Smith argues that although the Policy required Golden Rule to apply the same medical necessity requirement to both mental health and medical benefits, the allegations in the Complaint lay out a plausible claim that Golden Rule in fact applied a separate standard to presumptively deny coverage for IOP treatment and UA testing. [Filing No. 54 at 16-17.] Specifically, he argues that his allegations plausibly allege that Golden Rule's justifications for its denial of coverage "are insincere and bolster the plausibility that Golden Rule presumptively denies coverage to 'single out mental disorders, including substance use disorders, for disparate treatment,' by applying separate criteria other than medical necessity." [Filing No. 54 at 17 (quoting Filing No. 1 at 6).] Mr. Smith asserts that Golden Rule ignores the Parity Act requirement that it not place separate limitations on mental health coverage and instead focuses solely on the requirement that the limitations on mental health treatments not be more restrictive, which Mr. Smith argues is "a mistake of law." [Filing No. 54 at 18.] Mr. Smith also argues that although the medical necessity requirement on its face applies equally to mental health and medical coverage, the requirement as applied is not the same. [Filing No. 54 at 18-19.] He asserts that "Golden Rule in operation applied a presumption to deny coverage for IOP treatment and UA drug testing benefits—a separate treatment limitation applied only to mental health and substance use disorder benefits." [Filing No. 54 at 19.] In addition, Mr. Smith contends that the Complaint states a plausible claim that Golden Rule applied a more restrictive medical necessity requirement to UA

drug testing and IOP treatments than it did to medical and surgical benefits. [Filing No. 54 at 20-23.] He argues that he need not demonstrate that the medical services identified in the Complaint—outpatient surgical facilities, intensive day rehabilitation, and medical services including urine tests used to treat diabetes—are analogous to IOP treatment and UA drug testing, but rather must allege that they are in the same classifications, which he believes he has done. [Filing No. 54 at 21-22.] Mr. Smith also asserts that specific information or statistics concerning how often certain costs are covered is known by Golden Rule alone and can only be obtained through discovery. [Filing No. 54 at 22.] He argues that whether a disparity exists between coverage of particular types of services is a topic of expert opinion, and such opinions are not required at the pleading stage. [Filing No. 54 at 22.] Mr. Smith argues that the Seventh Circuit has "squarely rejected the premise of Golden Rule's argument—that a plaintiff must plead all legal elements of the Parity Act plus facts corresponding to each factor—as "materially inappropriate." [Filing No. 54 at 22-23 (citing *Chapman v. Yellow Cab Coop.*, 875 F.3d 846, 848 (7th Cir. 2017)).] He argues that his Complaint provides Golden Rule fair notice of plausible Parity Act violations, and there is nothing vague about his allegations. [Filing No. 54 at 23.] Finally, Mr. Smith discusses ten different decisions from other district courts, arguing that they are "better-reasoned" than the cases cited by Golden Rule and that they support the denial of Golden Rule's motion to dismiss. [Filing No. 54 at 23-27.]

In reply, Golden Rule asserts that "[a]ll of the cases cited by both sides show that, to state a claim under the Parity Act, the Complaint needs to identify a discriminatory 'treatment limitation'—*i.e.*, a coverage guideline, process, or standard through which a plan discriminates against behavioral health coverage, as compared to medical coverage," but Mr. Smith fails to do so both in his Complaint and in his response to the motion to dismiss. [Filing No. 59 at 5.] Golden

Rule argues that although Mr. Smith attempts to assert two separate violations of the Parity Act—
"(1) that Golden Rule applies a 'separate' limitation consisting of 'the policy's medical necessity
treatment limitation standard *as applied*' to substance abuse treatment and (2) that Golden Rule
uses a 'more restrictive' application of the same medical necessity limitation"—the allegations are
so vague that no practical difference can be discerned between these two purported violations.
[Filing No. 59 at 7-8 (emphasis in original).]  Regardless, Golden Rule argues, Mr. Smith fails to
identify a specific treatment limitation because he merely asserts that the manner in which Golden
Rule applies the medical necessity requirement is problematic, but "never explains what it is about
'the manner' that he is challenging." [Filing No. 59 at 8.] According to Golden Rule, the Complaint
contains "a series of confusing, unexplained assertions about presumptions" and it is "entirely
unclear from the Complaint what these 'presumptions' are or how they work, and there are *no
factual allegations* to support the existence of *any* presumptions."  [Filing No. 59 at 8 (emphasis
in original).]  Golden Rule argues that the fact that Mr. Smith disagrees with the denial of coverage
under the Policy does not transform this case into a Parity Act case and Mr. Smith failed to identify
any guidelines, standard, or other "treatment limitation" that caused any or all of the denials.
[Filing No. 59 at 9.]  Golden Rule asserts that Mr. Smith provides "no response" to the cases it
cited in its opening brief demonstrating that courts repeatedly dismiss Parity Act claims based on
vague assertions similar to those in the Complaint, and that the cases cited by Mr. Smith are easily
distinguishable. [Filing No. 59 at 10-11.]  Golden Rule also reiterates its argument that Mr. Smith
failed to plead facts regarding the coverage of analogous medical services, as would be required
to show a disparity between medical and substance-abuse-related services.  [Filing No. 59 at 11-
13.]  Golden Rule contends that Mr. Smith cannot rely on discovery to supply the details missing
from his Complaint and he should not be permitted to conduct a fishing expedition in search of a

discriminatory treatment limitation that he has not pled and that does not exist. [Filing No. 59 at 13.] Finally, Golden Rule asserts that all of the cases cited by Mr. Smith are distinguishable. [Filing No. 59 at 13-16.]

      1. Statutory Background

      The Parity Act, Pub. L. No. 110–343, Div. C §§ 511–12, 122 Stat. 3861, 3881 (Oct. 3, 2008), was codified in parallel amendments to the Employee Retirement Income Security Act of 1974 ("ERISA"), the Public Health Service Act ("PHSA"), and the Internal Revenue Code. *See*, *e.g.*, *Coal. for Parity, Inc. v. Sebelius*, 709 F. Supp. 2d 10, 13 (D.D.C. 2010) (citing 29 U.S.C. § 1185a; 42 U.S.C. § 300gg-5; 26 U.S.C. § 9812); *see also Natalie V. v. Health Care Serv. Corp.*, 2016 WL 4765709, at *2-*6 (N.D. Ill. Sept. 13, 2016) (discussing the enactment of the Parity Act and the implementing regulations). Because the Policy is a group plan provided through a consumer association, not an employer-sponsored plan, it is not subject to ERISA and Mr. Smith brings his claims pursuant to the PHSA parity provision, 42 U.S.C. § 300gg-26, which is enforceable through 42 U.S.C § 18031(j) and 45 C.F.R. § 147.160(a).[3] [Filing No. 1 at 3; Filing No. 1 at 17-20; Filing No. 54 at 12-13.]

      The Parity Act expanded the scope of prior legislation, the Mental Health Parity Act of 1996 ("MHPA"), Pub. L. No. 104–204, §§ 701-02, 110 Stat. 2874, 2944 (Sept. 26, 1996). *Coal. for Parity*, 709 F. Supp. 2d at 13. The MHPA and the Parity Act were "designed to end discrimination in the provision of coverage for mental health and substance use disorders as compared to medical and surgical conditions in employer-sponsored group health plans and health insurance coverage offered in connection with group health plans." *Id.*

---

[3] Both parties cite caselaw discussing and analyzing 29 U.S.C. § 1185a, the parity provision applicable to employer-sponsored plans under ERISA. Because the parity provisions are parallel, this caselaw is relevant to the Court's analysis.

In relevant part, the Parity Act provides:

> In the case of a group health plan or a health insurance issuer offering group or individual health insurance coverage that provides both medical and surgical benefits and mental health or substance use disorder benefits, such plan or coverage shall ensure that—
>
> . . .
>
> > (ii) the treatment limitations applicable to such mental health or substance use disorder benefits are no more restrictive than the predominant treatment limitations applied to substantially all medical and surgical benefits covered by the plan (or coverage) and there are no separate treatment limitations that are applicable only with respect to mental health or substance use disorder benefits.

42 U.S.C. § 300gg-26(a)(3)(A)(ii). "The term 'treatment limitation' includes limits on the frequency of treatment, number of visits, days of coverage, or other similar limits on the scope or duration of treatment." 42 U.S.C. § 300gg-26(a)(3)(B)(iii).

According to the implementing regulations, "[t]reatment limitations include both quantitative treatment limitations, which are expressed numerically (such as 50 outpatient visits per year), and nonquantitative treatment limitations, which otherwise limit the scope or duration of benefits for treatment under a plan or coverage." 45 C.F.R. § 146.136(a). Nonquantitative treatment limitations include "[m]edical management standards limiting or excluding benefits based on medical necessity or medical appropriateness." 45 C.F.R. § 146.136(c)(4)(ii)(A). The regulations further provide:

> A group health plan (or health insurance coverage) may not impose a nonquantitative treatment limitation with respect to mental health or substance use disorder benefits in any classification unless, under the terms of the plan (or health insurance coverage) as written and in operation, any processes, strategies, evidentiary standards, or other factors used in applying the nonquantitative treatment limitation to mental health or substance use disorder benefits in the classification are comparable to, and are applied no more stringently than, the processes, strategies, evidentiary standards, or other factors used in applying the limitation with respect to medical/surgical benefits in the classification.

45 C.F.R. § 146.136(c)(4)(i).

### 2.   Various Pleading Standards Used by Other District Courts

As the Utah District Court observed in *Michael W.*, "there is no clear law on how to state a claim for a Parity Act violation," and as a result, "district courts have continued to apply their own pleading standards." 420 F. Supp. 3d at 1234.  A brief review of these differing standards will therefore be helpful to the Court's analysis.

In *Welp*, the case upon which Golden Rule principally relies, the plaintiff sought and was denied insurance coverage for expenses incurred by his son, a covered beneficiary, during his participation in a therapeutic wilderness program to treat mental illness. 2017 WL 3263138, at *2. The plaintiff asserted a claim under the Parity Act, alleging that the health insurance plan created a separate nonquantitative treatment limitation on mental health services by denying coverage "based exclusively on the [P]lan's exclusion for all wilderness-related treatment without regard to the services' medical necessity." *Id.* at *4 (alteration in original).  The District Court for the Southern District of Florida concluded that the plaintiff had not stated a claim under the Parity Act, first noting that, contrary to the plaintiff's assertion, the plan did not contain a "blanket exclusion" for wilderness treatment programs, but rather established a classification of qualifying residential programs and articulated the relevant criteria for a program to be considered qualifying. *Id.* at *5.  The court explained that "to properly plead a Parity Act violation resulting from the denial of the wilderness program's coverage, the first thing Plaintiff must do is correctly identify the relevant limitation—here, the distinction between qualifying and non-qualifying [psychiatric residential treatment facilities]." *Id.*  The court then went on to explain that identifying the limitation is "not the end of the inquiry," because a plaintiff "must then allege a flaw in this limitation based on a comparison to a relevant analogue." *Id.*  Because the plaintiff's claim "consider[ed] wilderness programs in isolation," and the complaint was "virtually devoid of any

comparisons between the limitations imposed on mental health/substance treatments and those on medical/surgical analogues," the court determined that the plaintiff had failed to plead a violation of the Parity Act. *Id.* at *6. Although the *Welp* court observed that "at least two courts have rejected the suggestion that a complaint must spell out the particular medical/surgical criteria which 'demonstrate disparity,'" it concluded that "at the very least, a plaintiff must identify the treatments in the medical/surgical arena that are analogous to the sought-after mental health/substance abuse benefit and allege that there is a disparity in their limitation criteria." *Id.* at *6 (citations omitted).

Later, the *Michael W.* court reviewed the pleading standards applied by district courts considering Parity Act claims. 420 F. Supp. 3d at 1234-36. At the outset, *Michael W.* discussed a previous case, *Michael D. v. Anthem Health Plans of Kentucky, Inc*., 369 F. Supp. 3d 1159, 1174 (D. Utah 2019), in which the Utah District Court had considered the various pleading standards and concluded that the "prevailing" standard requires a plaintiff to allege:

> (1) the relevant group health plan is subject to the Parity Act; (2) the plan provides both medical/surgical benefits and mental health or substance use disorder benefits; (3) the plan includes a treatment limitation for mental health or substance use disorder benefits that is more restrictive than medical/surgical benefits; and (4) the mental health or substance use disorder benefit being limited is in the same classification[4] as the medical/surgical benefit to which it is being compared.

*Michael W.*, 420 F. Supp. 3d at 1234 (citing *Michael D.*, 369 F. Supp. 3d at 1174). *See also Gallagher v. Empire HealthChoice Assurance, Inc*., 339 F. Supp. 3d 248, 256 (S.D.N.Y. 2018) (applying the same standard). As explained in *Michael W.*, the *Michael D.* court "found several major flaws" with this prevailing standard, in particular its concern over "whether pleading

---

[4] The benefit classifications are: (1) "Inpatient, in-network"; (2) "Inpatient, out-of-network"; (3) "Outpatient, in-network"; (4) "Outpatient, out-of-network"; (5) "Emergency care"; and (6) "Prescription drugs." 45 CFR § 146.136(c)(2)(ii).

standards that required a successful claimant to allege a facially discriminatory exclusion, or a clear, covered surgical analog to the excluded mental health treatment, would be too restrictive." *Michael W.*, 420 F. Supp. 3d at 1234 (discussing *Michael D.*, 369 F. Supp. 3d at 1174-75) (internal citations omitted).

Both the *Michael W.* court and the *Michael D.* court also discussed *A.Z. v. Regence Blueshield*, 333 F. Supp. 3d 1069 (W.D. Wash. 2018). In *A.Z.*, the District Court for the Western District of Washington concluded that the "pertinent inquiry is whether Defendants' refusal to cover [a particular service] is an exclusion that applies equally to medical/surgical benefits and mental health or substance use disorder benefits." 333 F. Supp. 3d at 1078. In concluding that the reasoning applied in *Welp* did not control its analysis, the court observed that "the *Welp* court tailored its decision to the specific terms of the plan at issue and left open the possibility of alternative avenues for pleading a Parity Act violation." *Id.* at 1080. The *A.Z.* court also opined that post-*Welp* caselaw, including the Ninth Circuit's decision in *Danny P. v. Catholic Health Initiatives*, 891 F.3d 1155 (9th Cir. 2018), expanded on the pleading criteria outlined in *Welp* and "reaffirm[ed] the importance of conducting a case-by-case inquiry in deciding whether a Parity Act claim has adequately been plead." *A.Z.*, 333 F. Supp. 3d at 1080.[5] Ultimately, the court determined that, in order to state a Parity Act claim, a plaintiff can: (1) allege a facial Parity Act violation, which requires that the plaintiff "properly identify, either in the terms of the plan or the

---

[5] Of particular relevance, the *A.Z.* court discussed: *Danny P. v. Catholic Health Initiatives*, 891 F.3d 1155 (9th Cir. 2018) (observing that although the Parity Act was "quite clear" in the sense that "it directs that benefits and treatment limitations for mental health problems shall be 'no more restrictive' than those for medical and surgical problems[,] . . . it does not specifically address the precise scope of the Parity Act provisions for the myriad of situations that might arise. That leaves room for interpretation."); and *Vorpahl v. Harvard Pilgrim Health Ins. Co.*, 2018 WL 3518511, at *3 (D. Mass. July 20, 2018) ("Although it may be a 'close call,' it appears sufficient to allege, as Plaintiffs have, 'that a mental-health treatment is categorically excluded while a corresponding medical treatment is not' to state a Parity Act claim.").

administrative record, the relevant treatment limitation supporting that charge"; (2) "allege a 'categorical' mental-health exclusion without specifying the processes and factors used by a defendant to apply that exclusion—facts that would be solely within a defendant's possession at this stage in the litigation"; or (3) "allege an impermissible mental-health exclusion 'in application'—as opposed to a facial attack relying solely on the terms of the plan at issue." *Id*. at 1081-82 (citations omitted).

Ultimately, the *Michael W.* court determined that a plaintiff could state a claim under the Parity Act using any of the various pleading standards. 420 F. Supp. 3d at 1235. However, the Court expressly "decline[d] to impose" the "strict pleading standard adopted in *Welp*," opining that the *Welp* standard is inconsistent with two important principles: (1) courts in that jurisdiction generally favor allowing Parity Act claims to proceed to discovery because much of the information about the disparity between the availability of treatments for mental health and substance abuse disorders versus medical and surgical treatments, as well as the processes, strategies, evidentiary standards, and other factors considered in making coverage decisions, is often within the exclusive possession of the defendant; and (2) "even if plaintiffs do not plead a plausible *facial* Parity Act challenge to an insurance plan on its own terms, they may instead allege that the plan *as applied* by the insurance administrator violates the Parity Act." *Id*. (emphasis in original).

Courts in this Circuit have expressed similar concerns related to a Parity Act plaintiff's ability to obtain specific information at the pleading stage. For example, in *Craft v. Health Care Serv. Corp.*, 2016 WL 1270433, at *11 (N.D. Ill. Mar. 31, 2016), the court rejected the defendant's argument that the plaintiffs "failed to plead a cause of action under [the Parity Act] because they failed to allege 'treatment limitations on medical/surgical benefits which, when compared to

mental health benefits, demonstrate disparity.'"  In doing so, the court observed that "[e]specially at the pleading stage, 'patients are unlikely to be aware of the potential range of "recognized clinically appropriate standards of care" which may give rise to a difference in how mental health and medical services are treated and thus they would be left to speculate as to the clinical reasons for a particular disparity.'" *Id.* (citing *C.M. v. Fletcher Allen Health Care, Inc.*, 2013 WL 4453754, at \*6 (D. Vt. April 30, 2013)).

Similarly, in *Natalie V. v. Health Care Serv. Corp.*, 2016 WL 4765709, at \*2 (N.D. Ill. Sept. 13, 2016), the plaintiff alleged that her insurance company violated the Parity Act by excluding from coverage costs for inpatient residential mental health treatment.  The court denied the defendant's motion to dismiss, concluding that "the complaint adequately alleges (this will be tested in discovery) that [the defendant] failed to apply comparable standards when it decided not to cover residential treatment centers for mental illnesses." *Id*. at \*8.  The court noted that "[d]iscovery will reveal what sort of process, strategy, evidentiary standard, or other factors [the defendant] used in setting its treatment limitations, including its blanket ban on residential treatment centers for mental illness." *Id.*

The Court finds the analysis conducted by the *Michael W.* court persuasive and concludes that in order to state a claim under the Parity Act, a plaintiff may satisfy any one of the various pleading standards discussed above.  The ultimate question in any Parity Act case is whether the plaintiff has plausibly alleged that his health insurance plan applies a separate or more restrictive treatment limitation to mental health and substance abuse services versus medical and surgical services, and the different standards merely provide a framework for considering that question as it relates to the different types of Parity Act violations, including facially disparate treatment, categorical exclusions, and as-applied challenges.

3. Mr. Smith's Parity Act Claims

Mr. Smith alleges in the Complaint that the treatment "limitation at issue is the manner in which defendants interpret and calibrate its 'medically necessary' standard" as it relates to UA testing and IOP services. [Filing No. 1 at 18; Filing No. 1 at 20.]  Golden Rule argues that this limitation cannot support a Parity Act claim because under the plain language of the Policy, the medical necessity requirement applies to both mental health and substance abuse benefits and medical and surgical benefits.  This argument, however, ignores that fact that Mr. Smith's claim is not that the Policy *facially* violates the Parity Act, but rather that the Policy violates the Parity Act *as applied* to specific services.  Accordingly, contrary to Golden Rule's assertion, Mr. Smith need not identify a treatment limitation expressly outlined in the Policy that applies to mental health or substance abuse treatment but not to medical or surgical treatment; it is enough for him to allege that the facially neutral medical necessity requirement is applied disparately in practice.

Golden Rule's argument that Mr. Smith failed to identify analogous medical or surgical treatments also misses the mark.  Mr. Smith does point to analogous medical or surgical services and assert that they are treated differently than mental health and substance abuse services.  Specifically, he alleges that "defendants presumptively authorize coverage for . . . diagnostic tests, for blood glucose monitoring, for urine tests for diabetics, for insulin, for injection aids, syringes and needles, all used in the treatment of diabetes," while not presumptively authorizing coverage for UA tests, "even when treating physicians recommend it and even when such tests are considered standard and medically appropriate by the overwhelming majority of relevant providers."  [Filing No. 1 at 18.]  He further alleges that "defendants do not presumptively deny coverage for . . . services rendered at outpatient surgical facilities, intensive day rehabilitation and rehabilitation and chemotherapy treatment," but do not presumptively authorize coverage for IOP

21

services, "even when such services are considered standard and medically appropriate by the overwhelming majority of relevant providers." [Filing No. 1 at 20-21.] The gravamen of these allegations is clear: Mr. Smith believes that Golden Rule applies the medical necessity requirement in a different and more restrictive manner for mental health and substance abuse services, resulting in a greater rate of denial of coverage for those services than for analogous medical or surgical services.

Mr. Smith also alleges that, "[b]ased on a purported lack of medical necessity, defendants consistently single out mental disorders, including substance use disorders, for disparate treatment and refuse to cover charges incurred for the diagnosis and treatment of such disorders to the same extent as comparable charges arising out of medical/surgical services," and that Golden Rule does not cover charges related to the diagnosis and treatment of substance abuse to the same extent it covers comparable charges related to medical and surgical services. [Filing No. 1 at 6.] In support of these allegations, Mr. Smith includes facts concerning the denial of coverage for costs incurred by Collyer C., arguing that the offered reasons for the denials are disingenuous and are based on something other than a lack of medical necessity. Although the merits of Mr. Smith's claims are not at issue at this time, the Court must accept the allegations in the Complaint as true, and in doing so, concludes that Mr. Smith has at least plausibly alleged that Golden Rule applied the medical necessity requirement to Mr. Smith's claims differently than it would to medical or surgical claims. For example, the fact that Golden Rule denied coverage for IOP treatment based in part on the conclusion that there was no evidence of substance abuse, [Filing No. 31-2 at 5], despite the fact that Collyer C. had a history of mental health problems and substance abuse that ultimately claimed his life, [Filing No. 1 at 7-8], suggests that it is at least plausible that coverage was denied based on a more strict application of the medical necessity requirement.

Finally, Mr. Smith is not required to provide additional or more specific factual allegations concerning the analogous services or the specific process by which Golden Rule allegedly disparately applies the medical necessity standard.  First, the Seventh Circuit has acknowledged that "it is manifestly inappropriate for a district court to demand that complaints contain all legal elements (or factors) plus facts corresponding to each," and instead "[i]t is enough to plead a plausible claim, after which a plaintiff receives the benefit of imagination, so long as the hypotheses are consistent with the complaint." *Chapman*, 875 F.3d at 848 (internal quotations and citation omitted).  And second, as many district courts have acknowledged, more specific information is not within Mr. Smith's possession, and further discovery and potentially expert testimony will be required to prove or disprove whether the other identified services are in fact analogous or whether the medical necessity requirement is indeed applied differently to mental health and substance abuse services.  *See Craft*, 2016 WL 1270433, at *11; *Natalie V.*, 2016 WL 4765709, at *8.  *See also Melissa P. v. Aetna Life Ins. Co.*, 2018 WL 6788521, at *3 (D. Utah Dec. 26, 2018) ("Without knowing the criteria [the insurer] relies on to evaluate the analogue to [plaintiff's] claim for coverage, the Court cannot expect [the plaintiff] to allege the nonquantitative treatment limitations [the insurer] applied to those other services with specificity.  To require more would prevent any plaintiff from bringing a mental health parity claim based on disparate operation unless she had suffered the misfortune of having her admission to a skilled nursing facility for medical reasons approved and her admission to a residential treatment facility denied and thus would have had personal experience with both standards.").

In sum, Mr. Smith's allegations are sufficient to give Golden Rule "fair notice of what the . . . claim is and the grounds upon which it rests." *See Erickson*, 551 U.S. at 93.  Because Mr.

Smith has plausibly stated claims for violation of the Parity Act in Counts 3 and 4, Golden Rule's Partial Motion to Dismiss is **DENIED** to the extent that those claims **shall proceed**.

### B.  Injunctive Relief

Golden Rule argues that Mr. Smith's claims for injunctive or prospective relief should be dismissed for lack of standing and for failure to state a claim.   [Filing No. 32 at 20-22.] Specifically, Golden Rule asserts that all of Mr. Smith's allegations in the Complaint relate to past denials of coverage and there are no allegations supporting a claim for injunctive or prospective relief.  [Filing No. 32 at 20.]  Golden Rule also contends that Mr. Smith has not attempted to plead the elements of a claim for injunctive relief, including that: (1) he has suffered an irreparable injury; (2) remedies at law are inadequate; (3) an equitable remedy is warranted considering the balance of hardships between the parties; and (4) the public interest would not be disserved by a permanent injunction.  [Filing No. 32 at 22 (citing *eBay Inc. v. Mercexchange, L.L.C.*, 547 U.S. 388, 391 (2006)).]  In addition, Golden Rule argues that Mr. Smith lacks standing to pursue injunctive relief because he has not demonstrated that he is in immediate danger of injury, and a generalized interest in deterrence is insufficient to confer Article III standing.  [Filing No. 32 at 21.]  According to Golden Rule, the fact that this is a putative class action is irrelevant, because before a class is certified, the named plaintiff must demonstrate standing.  [Filing No. 32 at 21 (citing *Kohen v. Pac. Inv. Mgmt. Co. LLC*, 571 F.3d 672, 676 (7th Cir. 2009)).]

In response, Mr. Smith argues that he has standing to pursue injunctive relief because he is a current policyholder who pays monthly premiums for a policy that is required to comply with the Parity Act.  [Filing No. 54 at 27.]  He asserts that he claims injuries of over $40,000 for Golden Rule's violations of the Policy and the Parity Act, he is currently exposed to an increased risk of loss due to Golden Rule's unlawful practices, and the Policy is less valuable as a result.  [Filing

No. 54 at 28.]  He argues that it is likely "that a favorable decision will prevent or redress both injuries so that, going forward, [he] will have the Parity Act-compliant policy he pays for and will not need to battle with Golden Rule should he once again need to claim mental health benefits." [Filing No. 54 at 28.]  Mr. Smith contends that other district court decisions support his position that he has standing.  [Filing No. 53 at 28-29 (citing *Bond v. Liberty Ins. Corp.*, 2017 WL 1628956 (W.D. Mo. May 1, 2017); *Filiti v. USAA Cas. Ins. Co.*, 2007 WL 2345012, at *3 (E.D. Cal. Aug. 16, 2007)).]

In reply, Golden Rule asserts that Mr. Smith's response confirms that he lacks standing to pursue injunctive or prospective relief, because he pointed to no allegations to support any immediate danger of future injury and instead focused solely on his past financial injuries.  [Filing No. 59 at 16.]  Golden Rule argues that Mr. Smith lacks standing under the principles established by binding Seventh Circuit precedent, and the unpublished district court cases cited by Mr. Smith are distinguishable because the plaintiffs in those cases alleged a likelihood of future injury, whereas Mr. Smith's claims "turn on discrete and now-completed events involving past claims for benefits that are not likely to be repeated."  [Filing No. 59 at 16-17.]

"Standing is an essential component of Article III's case-or-controversy requirement," and therefore a threshold jurisdictional question. *Apex Digital, Inc. v. Sears, Roebuck & Co.*, 572 F.3d 440, 443 (7th Cir. 2009) (citing *Lujan v. Defenders of Wildlife*, 504 U.S. 555, 561 (1992)).  "[A] plaintiff must demonstrate standing separately for each form of relief sought," *Friends of the Earth, Inc. v. Laidlaw Envtl. Servs. (TOC), Inc.*, 528 U.S. 167, 185 (2000), and the fact that a plaintiff has standing to pursue damages does not mean that he has standing to pursue injunctive relief, *see Kenseth v. Dean Health Plan, Inc.*, 722 F.3d 869, 890 (7th Cir. 2013) ("A plaintiff may have standing to pursue damages but not injunctive relief, for example, depending on the

circumstances."). To demonstrate standing to seek injunctive relief, a plaintiff must satisfy the following requirements: (1) "he is under threat of suffering 'injury in fact' that is concrete and particularized"; (2) "the threat must be actual and imminent, not conjectural or hypothetical"; (3) the threat "must be fairly traceable to the challenged action of the defendant"; and (4) "it must be likely that a favorable judicial decision will prevent or redress the injury." *Summers v. Earth Island Inst.*, 555 U.S. 488, 493 (2009) (citing *Friends of the Earth*, 528 U.S. at 180-81). Allegations suggesting a "possible future injury are not sufficient," and a plaintiff must identify a "real and immediate threat," meaning "at least a substantial risk that such harm will occur." *Access Living of Metro. Chicago v. Uber Techs., Inc.*, 958 F.3d 604, 613 (7th Cir. 2020) (internal quotations, citations, and emphasis omitted).

In *Bond*, which Mr. Smith cites, the plaintiffs brought a lawsuit against their homeowner's insurance company after their home sustained hail damage. 2017 WL 1628956, at *1. The plaintiffs, on behalf of a putative class, sought an injunction requiring the insurance company to stop applying deductibles to actual cash value payments. *Id*. at *4. The District Court for the Western District of Missouri concluded that the plaintiffs had standing to seek injunctive relief, noting that there was no dispute that taking allegedly improper deductions from actual cash value payments "was [the insurance company]'s past practice and continues to be its present practice," and the plaintiffs alleged that they would be harmed if they made a future actual cash value claim for covered property damage and the insurance company improperly subtracted the deductible amount from the payout. *Id*. at *5. The court further observed that "[i]f the [plaintiffs'] risk of future property damage were so speculative and conjectural that it did not confer standing, it is difficult to understand the need for [the] insurance policy, which the [plaintiffs] and other putative class members purchased to protect themselves from such an injury." *Id*.

Similarly, in *Filiti*, the plaintiff brought suit against her auto insurance company, seeking, *inter alia*, an injunction preventing the company from "underpaying insurance benefits" by refusing to pay the full hourly labor rate for repairs. 2007 WL 2345012, at *1. The District Court for the Eastern District of California, in denying the insurance company's motion to reconsider the previous denial of the insurance company's motion to dismiss, concluded that the plaintiff pled facts plausibly alleging standing. *Id.* at *3. Specifically, the court observed that the plaintiff was "still insured by defendant and thus would be likely to suffer the same kind of loss if her car was damaged in the future." *Id.*

More recently, in *Briscoe v. Health Care Serv. Corp.*, 337 F.R.D. 158, 160 (N.D. Ill. 2020), three named plaintiffs brought a lawsuit against their health insurance provider, alleging that the provider violated the Patient Protection and Affordable Care Act by failing to cover comprehensive lactation support services without cost sharing. The District Court for the Northern District of Illinois concluded that two of the named plaintiffs lacked standing to seek prospective injunctive relief because they were no longer members of the insurance plan, and the third lacked standing because, although still a member of the plan, she did not offer any evidence suggesting that she would seek lactation services in the future. *Id.* at 162.

Mr. Smith has not alleged facts suggesting that he is under threat of actual and imminent injury sufficient to confer standing to pursue prospective injunctive relief. As *Briscoe* demonstrates, it is not sufficient that Mr. Smith is merely insured under the Policy; he must also establish a likelihood that he will be harmed in the future by Golden Rule's allegedly unlawful refusal to pay for UA testing, IOP treatment, or other substance abuse and mental health related services. Given that Collyer C., the recipient of the services at issue, has passed away and Mr. Smith has not alleged facts or offered evidence suggesting that any other covered beneficiary is

likely to receive such services in the future, the Court concludes that any future injury is too speculative and hypothetical to confer standing. *See Craft v. Health Care Serv. Corp.*, 2016 WL 1270433, at *3 (N.D. Ill. Mar. 31, 2016) (concluding that the plaintiff's allegation that the insurance company "will continue to deny her coverage because of its application of the overly restrictive medical necessity criteria" was "insufficient to plead an injury for purposes of Article III standing"). This is distinguishable from the potential for future injury in *Bond* and *Filiti*, where the continued ownership of a home and operation of a vehicle rendered it reasonably likely that the insureds would incur damage that would be covered under their policies. Although Mr. Smith and the covered beneficiaries will likely incur healthcare costs in the future that are covered under the Policy, there is nothing to indicate that those costs will be of the kind at issue in this litigation.

In addition, because a class has not yet been certified in this matter, only allegations concerning potential future injuries to Mr. Smith are relevant to the standing analysis; it does not matter that putative class members may have standing to seek injunctive relief. *See Kohen v. Pac. Inv. Mgmt. Co. LLC*, 571 F.3d 672, 676 (7th Cir. 2009) ("*Before* a class is certified, it is true, the named plaintiff must have standing, because at that stage no one else has a legally protected interest in maintaining the suit." (emphasis in original)). Furthermore, "a named plaintiff cannot acquire standing to sue by bringing his action on behalf of others who suffered injury which would have afforded them standing had they been named plaintiffs[.] . . . Standing cannot be acquired through the back door of a class action." *Payton v. Cty. of Kane*, 308 F.3d 673, 682 (7th Cir. 2002) (quoting *Allee v. Medrano*, 416 U.S. 802, 828-29 (1974) (Burger, C.J., dissenting)).

For all of these reasons, Golden Rule's Partial Motion to Dismiss is **GRANTED** to the extent that any and all claims seeking prospective injunctive relief are **dismissed**.

## IV.
### Conclusion

Based on the foregoing, Golden Rule's Partial Motion to Dismiss, [30], is G**RANTED IN PART** and **DENIED IN PART** as follows:

- The motion is **GRANTED** to the extent that any and all claims seeking prospective injunctive relief are **DISMISSED**; and

- The motion is **DENIED** as to Mr. Smith's Parity Act claims in Counts 3 and 4, which **SHALL PROCEED**.

Date: 3/11/2021

Hon. Jane Magnus-Stinson, Chief Judge
United States District Court
Southern District of Indiana

**Distribution via ECF only to all counsel of record**