UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF INDIANA
INDIANAPOLIS DIVISION

| | |
|---|---|
| COLLYER SMITH, *individually and on behalf of all those similarly situated*, ) ) | |
| ) | |
| *Plaintiff*, ) | |
| ) | No. 1:20-cv-02066-JMS-TAB |
| *vs.* ) | |
| ) | |
| GOLDEN RULE INSURANCE COMPANY, ) SAVVYSHERPA ADMINISTRATIVE SERVICES, ) LLC, and UNITED HEALTHCARE SERVICES, ) INC., ) | |
| ) | |
| *Defendants*. ) | |

## **ORDER**

Defendant Golden Rule Insurance Company issued a health insurance policy to Plaintiff

Collyer Smith ("Mr. Smith") that also provided coverage for Mr. Smith's son, Collyer C. Smith

("Collyer C."). After coverage was denied for certain substance-abuse-related treatments received

by Collyer C., Mr. Smith initiated this litigation on behalf of two putative classes of similarly

situated individuals against Golden Rule Insurance Company, Savvsherpa Administrative

Services, LLC, and United HealthCare Services, Inc. (collectively, "Golden Rule").[1]

---

[1] Mr. Smith alleges in his Complaint that Savvysherpa Administrative Services, LLC "performed administrative services for Golden Rule in performance of its contract duties," and that United HealthCare Services, Inc. "provides all employee services for Golden Rule." [Filing No. 1 at 3-4.] In their briefs on the pending motion, the parties address the three Defendants collectively either as "Defendants" or as "Golden Rule." [*See, e.g.*, Filing No. 97 at 13.] The Court will address the Defendants collectively as "Golden Rule" for purposes of this Order.

Presently pending is Mr. Smith's Motion for Class Certification, which is ripe for the Court's decision.  [Filing No. 83.][2]  In reviewing the parties' briefs on the Motion for Class Certification, the Court identified potential issues with Mr. Smith's standing to assert his individual claims.  The Court sought additional information from the parties, and that information confirmed the Court's concerns.  This Order sets forth the factual and procedural background of this case, then discusses standing – which is a threshold issue that the Court must consider at the outset – and Mr. Smith's Motion for Class Certification.  While some of the background facts relate exclusively to class certification, they provide an important backdrop for the Court's discussion.

# I.
## BACKGROUND[3]

### A.    The Policy

On February 1, 2013, Golden Rule issued an All Family Health Insurance Policy to Mr. Smith ("the Policy").  [Filing No. 1-1; Filing No. 83-9 at 2.]  It provided coverage to Mr. Smith, Mr. Smith's wife, and Collyer C. (as a dependent), including coverage for mental health and substance abuse treatment.  [Filing No. 1-1.]  The Policy provided coverage for "a loss as set forth in the policy," [Filing No. 1-1 at 10 (emphasis omitted)], and defined "Covered expense" as "an expense: (A) incurred while you or your dependent's insurance is in force under the policy; (B)

---

[2] Also pending are Golden Rule's Motion for Leave to File Limited Surreply to Respond to New Facts and Arguments in Plaintiff's Class Certification Reply Brief, [Filing No. 124], and Mr. Smith's Motion for Leave to File Corrected Report, [Filing No. 148].  The Court rules on both motions below.

[3] To the extent the Court quotes from sealed filings, the information quoted is integral to the Court's decision and therefore must be publicly available.  *In re Specht*, 622 F.3d 697, 701 (7th Cir. 2010) ("Documents that affect the disposition of federal litigation are presumptively open to public view, even if the litigants strongly prefer secrecy, unless a statute, rule, or privilege justifies confidentiality.")

covered by a specific benefit provision of the policy; and (C) not excluded anywhere in the policy."

[Filing No. 1-1 at 17 (emphasis omitted).]

The Policy further provided that "[e]ven if not specifically excluded by the policy, no benefit will be paid for a service or supply unless it is:…(B) Medically necessary to the diagnosis or treatment of an injury or illness." [Filing No. 1-1 at 41 (emphasis omitted).] "Medically necessary" is defined as:

> [A] treatment, test, procedure or confinement that is necessary and appropriate for the diagnosis or treatment of an illness or injury. This determination will be made by us based on our consultation with an appropriate medical professional. A treatment, test, procedure or confinement will not be considered medically necessary if: (A) it is provided only as a convenience to the covered person or provider; (B) it is not appropriate for the covered person's diagnosis or symptoms; or (C) it exceeds (in scope, duration, or intensity) that level of care which is needed to provide safe, adequate, and appropriate diagnosis or treatment to the covered person.
>
> The fact that any particular doctor may prescribe, order, recommend, or approve a treatment, test, procedure, or confinement does not, of itself, make the treatment, test, procedure or confinement medically necessary.

[Filing No. 1-1 at 20 (emphasis omitted).]

The Policy specifically provided certain coverage for substance abuse treatment, and defined "Substance abuse" as "alcohol, drug or chemical abuse, overuse or dependency." [Filing No. 1-1 at 22.] The Policy excluded coverage for inpatient treatment for substance abuse, stating:

> No benefits will be paid under these Rehabilitation and Extended Care Facility Expense Benefits for charges for services or confinement related to treatment or therapy for mental disorders or substance abuse.

[Filing No. 1-1 at 38 (emphasis omitted).] However, the Policy also included an Optional Mental Disorder Benefits Rider, which states:

> By attachment of this rider, the policy/certificate is amended to the extent of any conflict with the following:

3

> Covered expenses are amended to include charges incurred for the diagnosis and treatment of mental disorders, including substance abuse, to the same extent as any other illness under the policy/certificate.  Unless specifically stated otherwise, benefits for mental disorders and substance abuse are subject to the terms and conditions of the policy, including any applicable deductible amounts, coinsurance and copayment amounts.
>
> This rider will not change, waive or extend any part of the policy/certificate, other than as stated herein.

[Filing No. 1-1 at 59 (emphasis omitted).]

A random sample of health insurance contracts issued by Golden Rule to 21 policyholders indicated that 17 of those policies (or 81%) contained an identical definition of "medically necessary." [Filing No. 138 at 4-5.]  The remaining 4 policies, unlike Mr. Smith's Policy, provided that medically necessary treatment must also be "[a]s cost effective as any established alternative service, supply, or drug that is as likely to produce equivalent therapeutic or diagnostic results as to the diagnosis or treatment of the covered person's illness, injury, condition, disease, or its symptoms." [Filing No. 138 at 4-5 (emphasis omitted); *see also* Filing No. 96-13 at 32; Filing No. 96-14 at 26; Filing No. 96-15 at 26; Filing No. 96-16 at 44.]

### B.     Golden Rule's Claims Process

When Golden Rule receives a claim under the Policy, it obtains the necessary medical records in connection with the services and: (1) generally sends the information to one of three companies – Medical Examiners Services ("MES"), Medical Review Institute of America ("MRIOA"), and MCMC, LLC ("MCMC") (collectively, the "Third-Party Review Companies") – who employ medical professionals ("Third-Party Reviewers") to review the services for a medical necessity determination; or (2) sometimes sends the information to Golden Rule's internal medical director to review the claim.  [Filing No. 83-2 at 7-9; Filing No. 125-1 at 6-9; Filing No. 125-2 at

4-5.]  This process is used for determining medical necessity for all types of medical treatment, not just substance abuse treatment.  [Filing No. 83-2 at 9.]

Golden Rule has no policy or procedure that instructs the Third-Party Review Companies regarding how to conduct medical necessity determinations for substance abuse coverage issues. [Filing No. 83-2 at 11-12.]  Golden Rule also does not instruct the Third-Party Reviewers regarding the appropriate standards of care that apply to substance abuse treatment.  [Filing No. 83-3 at 5.] Golden Rule does, however, provide the controlling Policy language to the Third-Party Reviewers. [Filing No. 125-1 at 6; Filing No. 125-1 at 12; Filing No. 125-1 at 15; Filing No. 125-1 at 18; Filing No. 125-3 at 4; Filing No. 125-3 at 6-7.]

### C.    Collyer C.'s Relevant Substance Abuse Treatment

Collyer C. had battled substance addiction since he was a teenager, and had sought treatment for mental health problems and opioid addiction.  [Filing No. 83-9 at 2.]  In 2017, Collyer C. voluntarily enrolled in a five-month program at PACE Recovery Center ("PACE"), a nationally-recognized mental health and addiction treatment center.  [Filing No. 83-9 at 2.]  Part of this treatment was what the Smiths claimed was an intensive outpatient program ("IOP"), which treated addiction and mental health illness by providing support mechanisms and coping strategies and assisting with relapse management.  [Filing No. 83-9 at 2.]  IOPs are geared toward individuals, like Collyer C., who are more stable and do not require daily detoxification or round-the-clock supervision.  [Filing No. 83-9 at 2.]  Collyer C. incurred $44,290 in costs for his treatment at PACE.  [Filing No. 83-9 at 2.]

While at PACE and also after his discharge, Collyer C. had random urine analysis tests ("UAs") to assess and monitor his condition.  [Filing No. 83-9 at 2.]  Collyer C. incurred $1,560.30 in costs for the UAs he had during this time.  [Filing No. 83-9 at 2.]  Collyer C. died from a drug

overdose on January 12, 2018, shortly after completing his treatment at PACE.  [Filing No. 83-9 at 2.]

### D.     Mr. Smith's Claims Under the Policy

Leading up to his treatment at PACE, Golden Rule had paid some of the claims for substance abuse treatment which Collyer C. had submitted over a period of several years, including hospitalizations and outpatient therapy.  [Filing No. 96-2 at 72-76.]  After Collyer C.'s treatment at PACE, Mr. Smith submitted the $44,290 in claimed IOP costs and the $1,560.30 in UA costs to Golden Rule for coverage under the Policy.  [Filing No. 83-9 at 2.]

### 1.     Golden Rule's Denial of Collyer C.'s Claims for IOP Services

On March 9, 2018, Golden Rule sent a letter to Mr. Smith regarding the IOP claims related to Collyer C.'s treatment at PACE.  [Filing No. 96-6 at 3-4.]  The letter stated:

> We have completed our review of your claims from Pace Recovery Center.  During our review, we obtained your medical records from Pace Recovery Center.
>
> A physician has reviewed the medical information and determined that the services are not "medically necessary" as defined by your health insurance plan.  Therefore, benefits are not available for these services.
>
> The principal reason(s) and medical rationale for this decision is enclosed with this letter, along with a copy of the plan's definition of "medically necessary."
>
> You and your physician make the final decisions about your medical care. However, you may be required to pay for services that you receive.   Benefit decisions are subject to the terms and conditions of your insurance plan.

[Filing No. 96-6 at 3.]

Golden Rule attached the Third-Party Reviewer's report to the March 9, 2018 letter, which stated in relevant part:

> According to the attached definition, the IOP services from 9/11/17-12/28/17 were not medically necessary.

6

> The available documentation does not clearly detail the reasons for the patient's admission to the IOP level of care.  Specifically, there is a lack of information concerning specific information related to the patient's frequency and intensity of substance use.  In addition, there is no evidence of need for continued treatment at the IOP level of care.  Therefore, the plan language definition of medically necessary was not met due to the treatment not being appropriate for the symptoms documented, and the treatment in question exceeds in intensity what was needed to provide safe and effective treatment.

[Filing No. 96-6 at 6-7.]

Mr. Smith appealed Golden Rule's decision regarding coverage for the IOP claims and in a May 3, 2018 letter, Golden Rule advised him that it was upholding its initial decision.  [Filing No. 97-3 at 3-4.]  Golden Rule attached the Third-Party Reviewer's opinion, which stated:

> The patient was admitted to [the PACE] program, which was billed as an intensive outpatient program (IOP), but the patient appeared to be living on campus.
>
> *          *          *
>
> The requested SA IOP from 9/12/17-12/29/17 was in excess of the patient's needs.  The patient had not used since June of 2017 and had no withdrawal symptoms.  The patient was medically stable and had social supports.  The patient had some anxiety, but no acute functioning concerns that required a structured program.  In addition, though IOP was billed, the patient appeared to be in a residential setting given the patient did not transition to a sober living environment (SLE) until the end of the week of 12/04/17.  The case management notes also referenced that until December of 2017, the patient was in a residential setting.  If the patient was in a structured environment or more of a residential setting, this is a misrepresentation of services and is a potential quality issue.

[Filing No. 97-3 at 7.]

    2.    *Golden Rule's Denial of Collyer C.'s Claims for UAs*

As for costs associated with the UAs, the Third-Party Reviewers concluded that the UAs Mr. Smith submitted to Golden Rule were not clinically appropriate or medically necessary.  [*See, e.g.*, Filing No. 97-1 at 8.]  In a February 21, 2018 letter, Golden Rule wrote:

> We have completed our review of your testing from Alere Toxicology.  During our review, we obtained your medical records from Alere Toxicology and Pace Recovery Center.

> A physician has reviewed the medical information and determined that the services are not "medically necessary" as defined by your health insurance plan. Therefore, benefits are not available for these services.
>
> The principal reason(s) and medical rationale for this decision is enclosed with this letter, along with a copy of the plan's definition of "medically necessary."
>
> You and your physician make the final decisions about your medical care. However, you may be required to pay for services that you receive. Benefit decisions are subject to the terms and conditions of your insurance plan.

[Filing No. 97-1 at 3.] With the February 21, 2018 letter, Golden Rule enclosed a Peer Review Report which noted the data reviewed, included a three-page summary of the records reviewed, and listed the UAs for which Collyer C. sought coverage. [Filing No. 97-1 at 5-8.] The Peer Review Report stated:

> All of the above [UAs] are request[s] for definitive urine drug screen. Urine drug screening is medically necessary for treatment at all levels of care for addictive disorders. Frequency of testing should be individualized. Random frequency of screening is best. Urine drug testing should be conducted at initiation of treatment and when level of arousal is altered or when behavior is aberrant as well as approximately once per week at random interval[s] during the first 90 days of abstinence at all levels of care. Presumptive urine drug screening is usually sufficient. Definitive urine drug screening should only be performed when the presumptive urine drug screen conflict[s] with the patient's own account of his or her drug use or when a specific drug out of a drug class needs to be tested for or if the specific level of drug needs to be known…. The laboratory tests are not medically necessary and will continue to be not medically necessary until or unless a material change occurs in the diagnosis or treatment.

[Filing No. 97-1 at 8.]

Mr. Smith appealed Golden Rule's decision regarding coverage for the UA claims and in a May 3, 2018 letter, Golden Rule advised him that it was upholding its initial decision. [Filing No. 97-3 at 3-4.] Golden Rule attached the Third-Party Reviewer's opinion, which stated:

> [A]ll of the patient's UA's were negative and it appears that the patient was in a structured setting from September of 2017 – December of 2017 and there was no suspicion of use. None of these requests are recommended for approval as

appropriate, efficient and accurate testing, screening and results could have been provided with office-based urine dip stick testing.

All orders for confirmation testing require a positive screening test and shall be performed only for the drug class represent[ed] by the positive screening.  When testing is done in high risk populations, including those in addiction treatment, the criminal justice system and return to work settings after addiction treatment, American Society of Addiction Medicine (ASAM) encourages the use of random rather than schedule[d] drug tests.

[Filing No. 97-3 at 7.]

A total of four Third-Party Reviewers who were all Board-certified psychiatrists reviewed Collyer C.'s medical records and other claim-specific details, and after each review, all of the Third-Party Reviewers concluded that in their medical judgment the IOP and UA services were not medically necessary.  [Filing No. 97-1 at 5-9 (February 16, 2018 review of UAs by MES); Filing No. 97-2 at 6-8 (March 7, 2018 review of IOP services by MRIA); Filing No. 97-3 at 6-9 (May 1, 2018 review of IOP services and UAs by MRIA); Filing No. 97-4 at 2-4 (September 10, 2020 review – after this lawsuit was filed – of IOP services and UAs by MES).]

### E.    Golden Rule's Expert's Opinion

Golden Rule's expert, Dr. Steven Batki, reviewed Collyer C.'s medical records and relevant medical literature and concluded that Golden Rule's denials of the IOP services and UA charges were reasonable.  [Filing No. 97-6 at 10-14.]  Specifically, Dr. Batki opined that PACE's treatment plan for IOP services did not provide adequate clinical information about Collyer C.'s condition, its severity, and any past treatments; it did not list any treatment goals; and it failed to provide sufficient reasons for admission.  [Filing No. 97-6 at 11-13.]  Dr. Batki also concluded that the UAs performed by PACE were inconsistent with established standards, including that all of the UAs, except for one, were for definitive testing of only alcohol, even though the PACE treatment plan listed severe opioid use disorder as the first diagnosis and "Problem #1."  [Filing No. 97-6 at

13-14.]  Dr. Batki opined that any medical expert disputing a medical necessity determination would need to analyze the specific conditions, course of treatment, and medical records for the specific claims at issue.  [Filing No. 97-6 at 3-4; Filing No. 97-6 at 9-10; Filing No. 97-6 at 15-19.]

### F.    IOP and UA Claims Submitted by Other Insureds (Potential Class Members)

The parties negotiated the parameters for gathering certain data related to Golden Rule's payment of IOP and UA claims.  [Filing No. 84-5.]  Specifically, the data that was gathered (the "Claim Data Summary") provided details for claims involving the following procedure or revenue codes: (1) UA codes 80300-80377, 83992, G0431, and G0477-G0483; and (2) IOP Codes H0015, 90834, 90853, and 906/0906.[4]  [Filing No. 84-5 at 2.]  The claims also reflected a diagnosis code indicating substance abuse.  [Filing No. 84-5 at 3.]  All of the insureds whose claims are part of the Claim Data Summary are covered by association or individual non-ERISA Golden Rule insurance policies.  [Filing No. 84-5 at 3.]

The Claim Data Summary indicates the following:

- 11,558 claims meeting the criteria identified above were submitted between October 1, 2015 and June 14, 2021.  [Filing No. 84-5 at 3.]

- The 11,558 claims correspond to 538 unique policy numbers and 543 insureds. [Filing No. 84-5 at 3.]

- At least 396 insureds had UA claims denied as not medically necessary.  [Filing No. 84-5 at 3.]

- At least 71 insureds had IOP claims denied as not medically necessary.  [Filing No. 84-5 at 3.]

---

[4] The parties' Joint Stipulation relating to the Claim Data Summary states that "Defendants object to the inclusion of 'IOP codes' 90853 and 90834 in the Claim Data Summary because they argue that inclusion of those codes will identify individual or group therapy claims outside the context of intensive outpatient services, and are therefore outside the scope of any proposed class definition."  [Filing No. 84-5 at 2-3.]

- Some insureds had both UA and IOP claims denied.  [Filing No. 84-5 at 3.]

- For claims with UA codes that are part of the Claim Data Summary, Golden Rule: (1) paid 28% of those claims; (2) denied as not medically necessary 7% of those claims[5]; and (3) denied for other reasons 64% of those claims.

- For claims with IOP codes that are part of the Claim Data Summary, Golden Rule: (1) paid 57% of those claims; (2) denied as not medically necessary 13% of those claims; and (3) denied for other reasons 30% of those claims.

[Filing No. 84-5 at 3-4.]

After briefing on the Motion for Class Certification was completed, the Court requested that the parties provide the following information: "From October 1, 2015 to June 14, 2021, how many [UA] claims…were denied because the provider performed a definitive UA without first performing a presumptive or screening UA."  [Filing No. 133 at 1.]  The parties could not agree on a response, and each submitted their view of the correct answer.  Golden Rule states that:

- Of a random sample of 35 UA denials, 12 were based at least in part on the fact that the provider performed a definitive UA without first performing a presumptive UA.  6 of those 12 denials were also based on additional reasons, such as that the UAs were not medically necessary because they were not clinically supported by the record, scheduled too frequently, or on a non-random basis.

- Of the remaining 23 UA denials:

  o 10 were based on the conclusion that the UA should have taken place in a doctor's office rather than sent out to a lab;

  o 6 were denied for claim-specific reasons (for example, that the medical record did not indicate that the patient had relapsed, that no examinations

---

[5] A sampling of medical necessity reviews for other insureds showed that Golden Rule provided several reasons for denying UA claims, including that: (1) a presumptive UA test should have been done before a definitive test and was not; (2) the provider tested for more than the standard panel of drugs; (3) there was no explanation for why the testing was done on a certain day; (4) there was no record of relapse; (5) there was no indication that exams showed the patient would use drugs on an ongoing basis; and (6) documentation from the physician was boilerplate.  [Filing No. 111 at 6-7; Filing No. 112 at 4; Filing No. 113 at 3; Filing No. 115 at 3; Filing No. 118 at 11; Filing No. 119 at 2-3.]

provided justification for the UA, that the patient had admitted to drug use, or that the documents did not provide any details concerning the need for each UA test);

- o  5 were denied because presumptive UAs had been conducted and subsequent confirmatory testing was unnecessary; and

- o  2 were denied for unique reasons (no documentation that the billed presumptive testing had occurred, and UAs performed during IOP treatment were unnecessary because the IOP treatment was also not medically necessary).

[Filing No. 138 at 2-4.]

Mr. Smith disputes Golden Rule's figures and states that Golden Rule cannot precisely answer the question by using its database, and instead relies on coverage determinations it produced during discovery. [Filing No. 137 at 1-2.] Mr. Smith argues that "virtually all" of the 35 UA denials Golden Rule produced in discovery were for a failure to conduct presumptive testing before definitive testing, noting that:

- The 10 denials that Golden Rule claims were based on the conclusion that the UA should have taken place in a doctor's office rather than sent out to a lab could have been due to a failure to do a presumptive test first, because a presumptive UA can be performed in a doctor's office;

- 2 denials that Golden Rule claims were denied because presumptive tests were followed by a wide array of broad confirmatory testing "were based on the view that presumptive tests should come before confirmatory tests";

- 4 denials based on a lack of medical documentation could refer to a lack of qualitative tests; and

- A denial based on IOP medical necessity is not the same as a denial of a UA claim.

[Filing No. 137 at 1-3.]

### G.      The Lawsuit

After Golden Rule denied coverage for the $44,290 in IOP costs and the $1,560.30 in UA

costs, Mr. Smith initiated this litigation.   [Filing No. 1.]   He seeks to represent two classes of

similarly situated individuals:

The "UA Class," defined as:

All Golden Rule policyholders (a) whose health insurance contracts covered mental
health and substance abuse services (b) on whose behalf claims for urine drug tests
in connection with substance abuse treatment were submitted; (c) that were denied
(d) because the tests were deemed not "medically necessary" (or verbiage to the
same effect).

[Filing No. 86 at 13.]

The "IOP Class," defined as:

All Golden Rule policyholders (a) whose health insurance contracts covered mental
health and substance abuse services (b) on whose behalf claims for IOP services in
connection with substance abuse treatment [were] submitted; (c) that were denied
(d) because the services were deemed not "medical necessary" (or verbiage to the
same effect).

[Filing No. 86 at 13-14.][6]

Mr. Smith sets forth claims for: (1) breach of contract related to coverage for UAs; (2)

breach of contract related to coverage for IOP treatment; (3) breach of contract for violating the

Paul Wellstone and Pete Domenici Mental Health Parity and Addiction Equity Act of 2008 ("the

Parity Act") in connection with the denial of UA claims; and (4) breach of contract for violating

the Parity Act in connection with the denial of IOP claims.   [Filing No. 1 at 15-21.]   He originally

sought prospective and injunctive relief, but the Court granted Golden Rule's Motion to Dismiss

---

[6] The Court quotes the class definitions set forth by Mr. Smith in his brief in support of his Motion
for Class Certification, which differ slightly from the definitions he set forth in his Complaint, [*see*
Filing No. 1 at 13.]

as to any claims seeking that type of relief on March 11, 2021.  [Filing No. 65.]  Accordingly, only

Mr. Smith's claims for monetary damages remain.

## II.
### ARTICLE III STANDING

Before considering whether Mr. Smith's proposed classes meet the requirements of Rule

23, the Court must determine whether he has standing to sue under Article III of the United States

Constitution for his UA and IOP claims.  Standing is a threshold issue, and the Court must discuss

it at the outset.  *Bazile v. Finance System of Green Bay, Inc.*, 983 F.3d 274, 278 (7th Cir. 2020).

To have standing to sue in federal court under Article III, a plaintiff must establish: "(i) that he

suffered an injury in fact that is concrete, particularized, and actual or imminent; (ii) that the injury

was likely caused by the defendant; and (iii) that the injury would likely be redressed by judicial

relief."  *TransUnion LLC v. Ramirez*, 141 S. Ct. 2190, 2203 (2021) (citing *Lujan v. Defenders of

Wildlife*, 504 U.S. 555, 560-61 (1992)).

"Because standing is an essential ingredient of subject-matter jurisdiction, it must be

secured at each stage of the litigation."  *Bazile*, 983 F.3d at 278.  Although at the pleading stage

"general factual allegations of injury resulting from the defendant's conduct may suffice," *Lujan*,

504 U.S. at 561, "[o]nce the allegations supporting standing are questioned as a factual matter –

either by a party or by the court – the plaintiff must support each controverted element of standing

with 'competent proof,'" *Bazile*, 983 F.3d at 278 (quoting *McNutt v. Gen. Motors Acceptance Corp.

of Ind.*, 298 U.S. 178, 189 (1936)).  "Competent proof" means "a showing by a preponderance of

the evidence, or proof to a reasonable probability, that standing exists."  *Retired Chi. Police Ass'n

v. City of Chicago*, 76 F.3d 856, 862 (7th Cir. 1996).  Significantly, "a named plaintiff cannot

acquire standing to sue by bringing his action on behalf of others who suffered injury which would

have afforded them standing had they been named plaintiffs," and "a person cannot predicate

standing on injury which he does not share." *Payton v. County of Kane*, 308 F.3d 673, 682 (7th Cir. 2002) (quotation and citation omitted).  In short, "[s]tanding cannot be acquired through the back door of a class action." *Id.* (quotation and citation omitted).

### A.      The UA Class

The parties did not explicitly discuss standing in their class certification briefs, although Golden Rule remarked in a footnote that "[i]t is also well-established that a bare statutory violation does not confer Article III standing on a plaintiff unless it actually resulted in a concrete injury – here, the denial of coverage."  [Filing No. 97 at 29.]  Golden Rule also contends that Mr. Smith does not have standing to assert his UA claims because those claims fell within his Policy's deductible.  [Filing No. 97 at 37.]  This statement by Golden Rule prompted the Court to examine whether record evidence showed that Mr. Smith's UA claims were all within the Policy's deductible.  On February 24, 2022, the Court issued an Order requiring the parties to file a Joint Report or separate Reports answering several questions, including the following question related to standing:  "Were the IOP and UA claims for which Collyer C. Smith sought coverage and which are the subject of this lawsuit within the Policy's deductible?"  [Filing No. 133 at 2.]  The parties submitted separate Reports, in which they agreed that the Policy deductible had not been met for UA claims.  [*See* Filing No. 137 at 4-5 (Plaintiff's Report stating "As to the UA charges, even if the tests were determined to be medically necessary and counted against the deductible, plaintiff would still not meet the $8,000 'in network' threshold.  But that doesn't destroy plaintiff's standing. Among other things, plaintiff seeks an injunction to correct Golden Rule's processing errors.  This relief embraces recalculating every class member's deductible limits after the medically necessary UA tests are correctly included in the deductible calculation."); Filing No. 138 at 5-6 (Golden Rule's Report stating "Yes.  Plaintiff's UA claims were in-network, so they were subject to

15

Plaintiff's $8,000 annual in-network deductible…. Plaintiff had more than enough remaining in his deductible to cover his UA tests (which he alleges totaled $1,560.30 in total billed charges) – so Plaintiff would have needed to pay for the UAs out of pocket even if they had been covered.").]

Subsequently, in continuing to review the parties' submissions related to Mr. Smith's Motion for Class Certification, the Court began to question whether Mr. Smith has standing to assert his IOP claims. Accordingly, it issued an Order to Show Cause on March 31, 2022, in which it required Mr. Smith to show cause why the Court does not lack subject-matter jurisdiction over his IOP claims due to a lack of standing. [Filing No. 141 at 4.] In the Order to Show Cause, the Court stated:

> The Court acknowledges that Golden Rule has also raised an issue regarding whether Mr. Smith has standing to assert his UA claims in this case, arguing that those claims fell within the Policy's separate $4,000 deductible. Because the Court has sufficient information on which to base a decision on that issue, Mr. Smith need not address standing for his UA claims in his submission.

[Filing No. 141 at 4.] The Order to Show Cause also provided Golden Rule with an opportunity to file a response to Mr. Smith's submission. [Filing No. 141 at 4.]

Despite the Court's directive, Mr. Smith did address standing for the UA claims in his response to the Order to Show Cause. [*See* Filing No. 144 at 7-8.] Specifically, Mr. Smith argued for the first time that invoices from PACE show that "Golden Rule denied $15,660 for UA services incurred in 2017 at [PACE]. This total is correctly added to the denied therapy charges to calculate Plaintiff's satisfied 2017 deductible. Golden Rule's denial lumped the UA services and IOP services together, which prevented Plaintiff from understanding that both IOP and UA services received at [PACE] were denied. Fortunately, Golden Rule separately coded the UA services, which enabled Plaintiff to identify the 2017 denied UA charges." [Filing No. 144 at 8 (emphasis omitted).] Mr. Smith also filed a Motion for Leave to File Corrected Report, in which he seeks to

change his response to the Court's question in its February 24, 2022 Order regarding whether Mr. Smith's UA claims were within the Policy's deductible. [Filing No. 148.] In his proposed correction to his earlier answer, Mr. Smith states: "Detailed billing records of [PACE] submitted to Golden Rule show that the total amount of claims submitted was $40,360, of which $17,070 were incurred after October 21. All claims concerned IOP care. Many of these claims were submitted with CPT code 80306, signifying that the service performed was UA. The total amount of UA claims was $15,660, of which $8,640 were incurred after the deductible was exhausted." [Filing No. 148-1 at 4.]

In its response to Mr. Smith's submission to the Order to Show Cause, Golden Rule argues that Mr. Smith "now claims – for the first time in the two-year history of this case – that some of his payments to [PACE] were for UA tests…. But these claims and codes do not show anything about how much [Mr. Smith] paid to [PACE], or for what." [Filing No. 149 at 9.] Golden Rule goes on to cite examples from the pleadings in this case, Mr. Smith's sworn interrogatory responses, payment records produced in discovery, Mr. Smith's sworn deposition testimony, Mr. Smith's briefing on his Motion for Class Certification, and Mr. Smith's original response to the Court's February 24, 2022 Order, all of which it argues show that Mr. Smith's UA claims were limited to the $1,560.30 that Mr. Smith paid to Alere Toxicology for UA tests. [Filing No. 149 at 9-14.] Golden Rule also opposes Mr. Smith's efforts to file a Corrected Report to change his response regarding whether he had satisfied the deductible for the UA tests. [Filing No. 155.] It argues that Mr. Smith has represented numerous times that his UA claims were limited to $1,560.30 and also that his inability to ascertain the damages he seeks in connection with his UA claims highlights the inappropriateness of class treatment for those claims. [Filing No. 155 at 1-4.]

Mr. Smith filed a reply in support of his Motion for Leave to File Corrected Report, in which he argues that Golden Rule does not "dispute the basis for the correction," and that providing the Court with accurate information is sufficient cause for filing a corrected report.  [Filing No. 156 at 1-2.]

For nearly two years and since filing this lawsuit in August 2020, Mr. Smith has maintained that his UA claims total $1,560.30 in charges from Alere Toxicology.  Examples of this include:

- Mr. Smith's allegations in the Complaint that:

    o The UA tests were "performed by Alere Toxicology." [Filing No. 1 at 8.]

    o "Between late 2017 and early 2018, [Collyer C.] was given several dozen urine tests.  In all, his father was charged $1,560.30 for the tests." [Filing No. 1 at 8.]

    o "All of the Alere UA drug tests were submitted to defendants for payment. Defendants refused to pay for a single test." [Filing No. 1 at 8.]

- Mr. Smith's statement in his response to Golden Rule's Motion to Dismiss that he "submitted the cost of his son's…UA drug testing ($1,560.30) to Golden Rule for reimbursement under his health insurance policy." [Filing No. 54 at 8.]

- Mr. Smith's statement in his brief in support of his Motion for Class Certification that he "was forced to pay…$1,560.30 for UA testing." [Filing No. 86 at 13.]

- Mr. Smith's statement in his Declaration in support of his Motion for Class Certification, in which he stated:  "While at PACE, and later after his discharge, Collyer C. had random UAs to assess and monitor his condition while in the IOP program and sober living environment.  I submitted the cost of [my] son's IOP treatment ($44,290) and UA drug testing ($1,560.30) to defendants for reimbursement under my health insurance contract." [Filing No. 83-9 at 2.]

- Mr. Smith's statements in his Report in Response to Questions Presented in February 24, 2022 Order [Docket Entry #133], that:

- o   The Policy had an $8,000 deductible "for network providers (which applied to the UA tests)." [Filing No. 137 at 3.][7]

- o   "As to the UA charges, even if the tests were determined to be medically necessary and counted against the deductible, [Mr. Smith] would still not meet the $8,000 'in network' threshold.  But that doesn't destroy [his] standing.  Among other things, [Mr. Smith] seeks an injunction to correct Golden Rule's processing errors.  This relief embraces recalculating every class member's deductible limits after the medically necessary UA tests are correctly included in the deductible calculation." [Filing No. 137 at 4-5.]

- Mr. Smith's sworn Answers to Golden Rule Insurance Company's First Set of Interrogatories, in which he:

  - o   Identified his UA claims as "described in detail in paragraphs 22-27 of the Complaint[, which refer only to Alere Toxicology tests totaling $1,560.30]." [Filing No. 96-19 at 2.]

  - o   Responded to the interrogatory "For each claim for benefits identified in response to Interrogatory No. 1, state the amount of benefits and/or other monetary relief that you seek" with "For the UA charges, $1,560.30." [Filing No. 96-19 at 3.]

- Documents produced by Mr. Smith in discovery, which included seven checks to Alere Toxicology for UA tests totaling $1,377.15.  [See Filing No. 96-27 at 2 (Mr. Smith's counsel stating in an email to Golden Rule's counsel: "[t]urning to the UA services, we provided to you seven canceled checks…for services rendered by Alere totaling $1,377.15.").]

- Mr. Smith's deposition testimony, including the following:

  - o   Q:  And then going back to the top of the letter it lists the name of the provider as Alere Toxicology?  A:  Correct.  Q:  And the dates of service from September 9, 2017, to January 8th, 2018?  A:  Yes.  Q:  And those are dates of service that you're seeking reimbursement for in this lawsuit for urinalysis drug tests?  A:  I believe those are the dates, right.  [Filing No. 150-2 at 11.]

  - o   Q:  So [the Complaint] says you were charged $1560.30 for urine tests?  A:  I see that.  Q:  And those are the amounts that you paid?  A:  Yeah, that would be a culmination of all the testing.  [Filing No. 150-2 at 14-15.]

---

[7] The parties agree that PACE is an out-of-network provider, so any UA tests provided by PACE would be out of network and subject to the $16,000 deductible.  This is further evidence that Mr. Smith's UA claims are limited to those provided by Alere Toxicology.

19

- o  Q:  How did you arrive at the $1560.30 figure?  A:  I added them – I added all the bills up and that's what it came about to.  Q:  You added the bills from Alere?  A:  Yes.  Q:  Or did you add checks that you paid?  A:  I added the bills and verified with the checks.  I matched them.  [Filing No. 150-2 at 16.]

- o  Testimony in which he reaffirmed the accuracy of his interrogatory responses.  [*See* Filing No. 150-2 at 18-19.]

- •  Correspondence in which Golden Rule's counsel asked Mr. Smith's counsel to confirm the amount Mr. Smith was seeking for UA claims, and in which counsel for Mr. Smith confirmed that seven canceled checks had been provided which actually totaled $1,377.15.  [Filing No. 150-3; Filing No. 150-4; Filing No. 150-5.]

In sum, Mr. Smith has maintained throughout this litigation, up until just a few weeks ago, that he paid $1,560.30 (or maybe even just  $1,377.15) in UA charges and that he is seeking that amount in this lawsuit in connection with his UA claims.  Discovery in this case closed on December 6, 2021, and Mr. Smith never sought to supplement his interrogatory answers or any other filings or representations containing the $1,560.30 figure until now.  The Court determines that this attempt to salvage the UA claim, in the face of a standing challenge, comes too late in the litigation for justice to allow it. Mr. Smith will be bound by his numerous and consistent representations that he is seeking $1,560.30 for his UA claims.[8]  *See Christopher v. Liu*, 861 Fed. Appx. 675, 678-79 (7th Cir. 2021) (recognizing district court's discretion to limit plaintiff's claims where the complaint was a "moving target" and plaintiff was attempting to expand claims shortly before dispositive motion deadline, which would require additional discovery); *Moultrie v. Penn*

---

[8] Mr. Smith's Motion for Leave to File Corrected Report, [Filing No. 148], is **GRANTED IN PART** to the extent that the Court has reviewed and considered Mr. Smith's Corrected Report in Response to Questions Presented in February 24, 2022 Order [Correcting Docket Entry #137], [Filing No. 148-1], but is **DENIED IN PART** to the extent that the Court has found that Mr. Smith may not change his position to now seek UA charges that are outside of the $1,560.30 in UA charges from Alere Toxicology.

*Aluminum Intern., LLC*, 766 F.3d 747, 753 (7th Cir. 2014) (criticizing plaintiff for presenting claims that were "something of a moving target"). That amount is undisputedly well within the Policy's $8,000 deductible. Because the amount is within the deductible, Mr. Smith did not suffer an injury in fact as a result of Golden Rule's denial of his UA claims. Accordingly, Mr. Smith lacks standing, the Court does not have subject-matter jurisdiction over Mr. Smith's UA claims, and they are **DISMISSED**.[9]

**B.     The IOP Class**

In reviewing the briefing on Mr. Smith's Motion for Class Certification, the Court has also questioned whether Mr. Smith has standing to assert his IOP claims. In its February 24, 2022 Order, the Court asked whether the IOP claims for which Collyer C. sought coverage and which are the subject of this lawsuit were within the Policy's deductible. [Filing No. 133 at 2.] Mr. Smith responded that the IOP charges were not within the deductible because Golden Rule "stated that [he] paid $44,290 for services rendered between September 11, 2017 and December 28, 2017," and "Golden Rule provided a single reason for the denial of these charges: it claims that the services were not medically necessary." [Filing No. 137 at 4.] He argues that "[i]f he is correct that these services were medically necessary, then the entire $44,290 is a 'covered expense' that applies against the deductible, easily clearing the $16,000 threshold. The single-page billing statement on which Golden Rule relies, which it had not received when it denied the claims,

_____

[9] The Court is perplexed by Mr. Smith's continued reliance on the argument that even if the UA charges from Alere Toxicology are within the deductible, he still has standing because he "seeks an injunction to correct Golden Rule's processing errors" and "[t]his relief embraces recalculating every class member's deductible limits after the medically necessary UA tests are correctly included in the deductible calculation." [Filing No. 137 at 4-5; Filing No. 148-1 at 5.] This argument is completely without merit because the Court dismissed all of Mr. Smith's claims for injunctive relief over a year ago. [Filing No. 65 at 24-28.] It is axiomatic that Mr. Smith cannot rely on claims that no longer exist to establish that he has standing.

21

represents an improper attempt to raise a new coverage defense that Golden Rule did not raise during the mandatory appeal process and should be rejected." [Filing No. 137 at 4.]  Mr. Smith did not submit any billing documents from PACE when responding to the Court's February 24, 2022 Order, but in response to the Order to Show Cause he submitted documents which he argues "are all admissible through the business records exception to the hearsay rule, [and] demonstrate that [he] incurred out-of-network charges for medical treatment in excess of his $16,000 out-of-network deductible in 2017." [Filing No. 144 at 3.]  Specifically, Mr. Smith points to electronic documents that were produced by Golden Rule during discovery and that he claims show that PACE "charged $24,700 to [Collyer C.] in the last quarter of 2017 for therapy services." [Filing No. 144 at 4-6.]  Mr. Smith also notes that he produced bank and credit card statements reflecting that he paid a total of $58,000 to PACE in 2017.  [Filing No. 144 at 6.]  Further, he points to his deposition testimony, which he argues shows that Collyer C. "was receiving treatment at [PACE] while living in a separate facility, a sober living house, which did not offer 24-hour supervision or any medical services," and that "[t]here was no change in the living arrangement in December 2017." [Filing No. 144 at 6.]  He argues that "[t]hough the dollar value of the IOP claims in controversy varies among the sources of information, it always easily exceeds the $16,000 deductible threshold." [Filing No. 144 at 7.]

In its response, Golden Rule argues that most of PACE's services from September to December 2017 were for residential treatment, not IOP services, and that Mr. Smith only paid $4,000 for a few weeks of IOP treatment at the end of December 2017.  [Filing No. 149 at 3.] Golden Rule points to Mr. Smith's medical records, which it contends show that Mr. Smith received residential treatment from September to early December 2017 and then transitioned to a sober living environment (where he received IOP services) for the last few weeks of December

22

2017.  [Filing No. 149 at 4-7.]  Golden Rule also asserts that the records Mr. Smith produced show that he only paid $4,000 for IOP services, regardless of what IOP services were billed.  [Filing No. 149 at 7-8.]

Mr. Smith's position on his IOP claims – much like his UA claims – has been somewhat of a moving target.  In response to the Court's February 24, 2022 Order, he essentially argued that the IOP services totaled $44,290 because Golden Rule's denial of coverage was based on its conclusion that the services were not medically necessary and was not based on a finding that a portion of that amount did not correspond with IOP services.  But Mr. Smith did not produce any billing statements to support his position, instead simply arguing that Golden Rule was attempting to raise a new coverage defense.  Now, Mr. Smith claims that Collyer C. was living in a residential facility unaffiliated with PACE, and receiving IOP services from PACE from September to December 2017.  [Filing No. 144 at 6-7.]  He submits invoices for that time period which he contends support this notion, and also argues that a one-page statement from PACE, which reflects the types of payments he made to PACE and shows that the bulk of those payments were not for IOP services, is inadmissible.

Mr. Smith, as the party seeking to invoke the Court's subject-matter jurisdiction by filing this lawsuit, bears the burden of proving that he has standing.  *Kathrein v. City of Evanston, Ill.,* 636 F.3d 906, 914 (7th Cir. 2011).  At the outset, the Court notes Mr. Smith's reliance on the Policy's Optional Mental Disorder Benefits Rider, which appears to treat coverage for substance abuse the same as coverage for "any other illness" under the Policy.  [*See* Filing No. 144 at 9-10 (Mr. Smith arguing in response to the Court's Order to Show Cause that all of the services described in the one-page billing document from PACE (and which Mr. Smith claims is inadmissible) would be covered under the Optional Mental Disorder Benefits Rider).]  Mr. Smith seems to argue that

all of the PACE charges – whether residential or IOP – are covered under the Policy and should count toward satisfying the $16,000 out-of-network deductible. But the problem with that argument is that Mr. Smith has explicitly, and over and over, limited his claims in this case to those for UAs and IOP treatment. [*See, e.g.*, Filing No. 1 at 15-21 (setting forth claims for breach of contract and violation of the Parity Act related only to UAs and IOP services).] He cannot now expand his claim to argue that Golden Rule breached the Policy by denying coverage for residential treatment. Consequently, he cannot rely on his payment of charges for residential treatment to satisfy the Policy's $16,000 out-of-network deductible. In short, he has not claimed in this case that the charges corresponding to residential treatment were medically necessary, and they must have been in order to count toward the deductible.

Having found that only IOP charges count toward satisfying the deductible for Mr. Smith's IOP claims, the Court must determine whether Collyer C. was receiving inpatient treatment or IOP services from September 2017 to December 2017. Mr. Smith asserts that he was, pointing to his own deposition testimony and relying on invoices for that time period that he contends reflect IOP charges. At his deposition, Mr. Smith testified that Collyer C. was living at a "sober living house" and stated: "I think it was independent [from PACE] because I met the owner and I do not believe he was – he worked closely with [PACE] but I don't think he was an employee of [PACE]. I think he was an independent." [Filing No. 143-7 at 6.] Mr. Smith testified further that he thought Collyer C. stayed at the same sober living house from September through the end of December 2017, and that Collyer C. was transported from the sober living house to PACE for treatment. [Filing No. 143-7 at 6.] But Mr. Smith's belief that Collyer C. was living in a facility unaffiliated with PACE and being transported to PACE for IOP services for the entire period from September to December

2017 is not supported by Collyer C.'s medical records.   Specifically, the following records

contradict Mr. Smith's belief:

- September 9, 2017 records from PACE which state that on that date Collyer C. was picked up from a detox center and "transported to PACE for intake," "admitted into the program by PACE staff," his bags were searched and contraband seized, he was "oriented to [PACE]…[and] [the e]vacuation plan was reviewed with [him]." [Filing No. 97-1 at 134.]

- A September 11, 2017 Master Treatment Plan which reflects that Collyer C. was admitted on September 9, 2017 and that his anticipated discharge date was December 7, 2017 and his "living arrangements" for discharge would be "[t]ransition to sober living in local area." [Filing No. 97-1 at 131-32.]

- A September 13, 2017 record from PACE which lists Collyer C.'s "Level of Care" as "Residential." [Filing No. 97-1 at 154.]

- An October 26, 2017 record from PACE noting that Collyer C. "discussed family interaction and frustration with parental decision to follow clinical recommendations regarding transition to [a sober living environment ("SLE")]." [Filing No. 97-3 at 119.]

- A November 21, 2017 record from PACE which states that Collyer C. has "made the decision to transition to SLE in local area upon discharge from residential program." [Filing No. 97-2 at 129.]

- A December 1, 2017 record from PACE which noted that Collyer C. had "discussed progress on making decision regarding transition to SLE." [Filing No. 97-3 at 79.]

- A December 4, 2017 record from PACE which states that Collyer C. "explored his upcoming transition into outpatient, and his anxieties surrounding reengaging in 'real life.'" [Filing No. 97-2 at 147.]

- A December 5, 2017 record from PACE discussing Collyer C.'s level of "willingness to comply with parental expectations to transition to SLE.  It is hypothesized that [Collyer C.] will make an attempt to convince parents to allow him to come home upon transition to SLE." [Filing No. 97-3 at 55.] The record also notes that Collyer C. is "preparing for transition to SLE at the end of the week." [Filing No. 97-3 at 56.]

- December 15, 2017 and December 22, 2017 records from PACE which note that Collyer C. is "anxious due to his recent transition into Outpatient and Sober Living" and that Collyer C. "has transitioned into Outpatient and Sober Living." [Filing No. 97-2 at 153-54; Filing No. 97-2 at 156-57.]

- Charts from PACE reflecting that only $4,000 of the total amount billed by PACE for Collyer C.'s treatment from August 2017 to January 2018 was for IOP services – the rest was for "Bed Deposit/Ancillary Medical Fee," "Admission/30 Day Residential Treatment," and "30 Day Residential Treatment." [Filing No. 97-5 at 2; Filing No. 97-20 at 2.][10]

Mr. Smith has not sustained his burden of showing that the amounts he paid for IOP services provided by PACE to Collyer C. exceeded the Policy's deductible. Rather, Collyer C.'s medical records show that he was receiving inpatient treatment at PACE from September 2017 to early December 2017 when he transitioned to a sober living environment and began receiving IOP treatment. The cost of that IOP treatment, incurred only after Collyer C. moved to a sober living environment, was at most $4,000, which is well within the Policy's $16,000 deductible for IOP services. Accordingly, Mr. Smith does not have standing to assert claims for IOP services received by Collyer C. and the Court lacks subject-matter jurisdiction over those claims. *Ramirez*, 141 S. Ct. at 2205 ("Only those plaintiffs who have been concretely harmed by a defendant's statutory violation may sue that private defendant over that violation in federal court.") (emphasis omitted). Mr. Smith's IOP claims are **DISMISSED** for lack of jurisdiction.

### III.
### MOTION FOR CLASS CERTIFICATION

The Court has already found that Mr. Smith does not have standing to assert his individual claims related to unpaid UA and IOP expenses in this case, resulting in the dismissal of his claims for lack of subject-matter jurisdiction. Accordingly, because Mr. Smith has no individual claims,

---

[10] It is puzzling that Mr. Smith argues that these one-page charts from PACE, which the Court cited in its Order to Show Cause, are inadmissible, as Mr. Smith is the party that produced the documents in this litigation. But the Court need not decide whether the one-page charts reflecting that only $4,000 of the PACE charges were for IOP, [Filing No. 97-5; Filing No. 97-20], are admissible because, as discussed above, Mr. Smith has not established that the IOP services Collyer C. received exceeded the Policy's $16,000 deductible in any event.

his Motion for Class Certification is **DENIED**.[11]  [Filing No. 83.]  This is a final, appealable order, but the Court takes the time to note that even if standing were found upon appellate review, class treatment would likely not be appropriate.

In deciding whether to certify a class, the Court may not blithely accept as true even the most well-pleaded allegations of the complaint, but must instead "make whatever factual and legal inquiries are necessary under [Federal Rule of Civil Procedure] 23" to resolve contested issues. *Szabo v. Bridgeport Machs., Inc.*, 249 F.3d 672, 676 (7th Cir. 2001).  The Court must first find that the putative class is identifiable. *Oshana v. Coca-Cola Co.*, 472 F.3d 506, 513 (7th Cir. 2006). Then, the Court must find that the class satisfies the four prerequisites set forth in Federal Rule of Civil Procedure 23(a), which are that: "(1) the class is so numerous that joinder of all members is impracticable; (2) there are questions of law or fact common to the class; (3) the claims or defenses of the representative parties are typical of the claims or defenses of the class; and (4) the representative parties will fairly and adequately protect the interests of the class." Fed. R. Civ. P. 23(a).  Class certification is not appropriate unless the named plaintiff establishes all four prerequisites. *Gen. Tel. Co. of the Southwest v. Falcon*, 457 US. 147, 156 (1982).

If the putative class satisfies the prerequisites of Rule 23(a), the Court must additionally find that it satisfies the requirements set forth in Rule 23(b), which vary depending upon which of three different types of classes is proposed. *Oshana*, 472 F.3d at 513; *Williams v. Chartwell Fin. Servs.*, 204 F.3d 748, 760 (7th Cir. 2000).  Mr. Smith proceeds under Rule 23(b)(3), which requires

---

[11] Golden Rule has filed a Motion for Leave to File Limited Surreply to Respond to New Facts and Arguments in Plaintiff's Class Certification Reply Brief.  [Filing No. 124.] Because the Court denies Mr. Smith's Motion for Class Certification based on a lack of standing, it need not consider the arguments addressed in Golden Rule's proposed Surreply in Opposition to Plaintiff's Motion for Class Certification, which does not discuss the standing issue.  Accordingly, Golden Rule's Motion for Leave to File Limited Surreply to Respond to New Facts and Arguments in Plaintiff's Class Certification Reply Brief, [Filing No. 124], is **DENIED AS MOOT**.

him to show that "questions of law or fact common to class members predominate over any questions affecting only individual members, and that a class action is superior to other available methods for fairly and efficiently adjudicating the controversy." Fed. R. Civ. P. 23(b)(3).

Before becoming aware of a potential standing issue, the Court had noted several issues with certifying the proposed UA Class and IOP Class. These issues include, but are not limited to:

- Whether there are common issues of fact: Mr. Smith argues that UA and IOP claims were summarily denied based on medical necessity, but the Claim Data Summary shows that only 7% of the sample of UA claims and 13% of the sample of IOP claims were denied because they were not medically necessary.

- Whether common issues of fact predominate over individualized ones: For the breach of contract claims, each class member would need to show that the claims for which they did not receive coverage corresponded with services that were medically necessary. This would require individualized determinations. *See Wit v. United Behavioral Health*, 2020 WL 6462401, at *2 (N.D. Cal. 2020) (In a case where plaintiff only sought declaratory and injunctive relief, the court specifically stated that class treatment would be problematic if plaintiff were seeking monetary damages as each class member would need to show that the contract was breached – *i.e.*, that their treatment was medically necessary. The court noted that it was "of particular significance that Plaintiffs did not ask the Court to make determinations as to whether class members were actually entitled to benefits (which would require the Court to consider a multitude of individualized circumstances relating to the medical necessity for coverage and the specific terms of the member's plan).") (internal quotation, citation, and emphasis omitted)).

- Whether Mr. Smith's claims are typical of the class: As is evident from the above discussion, Mr. Smith's IOP claims were based on the services Collyer C. received from PACE from September 2017 to December 2017, but most of those services were actually for residential treatment.

- Plaintiff's initial theory was that UA and IOP claims are uniformly and presumptively denied, but he changed the theory in his reply to complain about outsourcing the medical necessity determination to third-parties. This new theory does not square with Mr. Smith's class definitions and further evidence would be needed regarding whether every claim was, in fact, outsourced.

- Mr. Smith has not presented any evidence that Golden Rule treated determining medical necessity for UA and IOP claims any differently than for other medical

services.  He would be required to do so in order for his Parity Act claims to be certified for class treatment.

These are just some of the issues that the Court identified in reviewing the parties' briefs on the Motion for Class Certification.  They should not be interpreted as final rulings, but are meant to highlight that standing is likely not the only issue that would preclude class certification.

In short, Mr. Smith does not have standing to assert his individual UA and IOP claims. Accordingly, all of his claims are **DISMISSED WITHOUT PREJUDICE**[12] and his Motion for Class Certification, [Filing No. 83], is **DENIED**.

## IV.
### CONCLUSION

This case involves tragic circumstances, and the Court is sympathetic to Mr. Smith and his loss.  But Congress limits this Court's power to decide controversies to those where the plaintiff has suffered an injury in fact at the hands of a defendant.  Because Mr. Smith has only asserted UA and IOP claims in this case, and since he has not shown that his payments for UA and IOP services fell outside of the Policy's deductible, he has not shown a concrete injury.  He therefore does not have standing to assert his claims and the Court does not have the power to decide those claims.  The Court is required to adhere to Congress's limitation on its jurisdiction.

Accordingly, for the foregoing reasons, the Court:

- **DISMISSES WITHOUT PREJUDICE** all of Mr. Smith's claims for lack of subject-matter jurisdiction.

- **DENIES AS MOOT** Golden Rule's Motion for Leave to File Limited Surreply to Respond to New Facts and Arguments in Plaintiff's Class Certification Reply Brief, [124];

---

[12] Because the Court finds that Mr. Smith does not have standing, it also finds that it lacks subject-matter jurisdiction over the case so must dismiss Mr. Smith's claims without prejudice. *See American Bottom Conservancy v. U.S. Army Corps of Engineers*, 650 F.3d 652, 661 (7th Cir. 2011) (dismissal for lack of standing is a finding that the court does not have jurisdiction, which requires dismissal without prejudice).

- **GRANTS IN PART** and **DENIES IN PART**, as set forth above, Mr. Smith's Motion for Leave to File Corrected Report, [148]; and

- **DENIES** Mr. Smith's Motion for Class Certification, [83].

Final judgment shall enter accordingly.

Date: 5/13/2022

Hon. Jane Magnus-Stinson, Judge
United States District Court
Southern District of Indiana

**Distribution via ECF only to all counsel of record**